**INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA,
Petitioner,**

v.

**MINE SAFETY AND HEALTH ADMINISTRATION, et al.,
Respondents,**

**Kaiser Coal Corporation, Intervenor.**

**INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA,
Petitioner,**

v.

**MINE SAFETY AND HEALTH ADMINISTRATION, et al.,
Respondents,**

**Utah Power & Light Company, Mining Division, Intervenor.**

**Nos. 86–1239, 86–1327.**

United States Court of Appeals,
District of Columbia Circuit.

Argued March 17, 1987.

Decided July 10, 1987.

As Amended July 10, 1987.

Mary Lu Jordan, with whom Michael H. Holland, Washington, D.C., was on the brief for petitioner. Earl R. Pfeffer, Washington, D.C., also entered an appearance for petitioner.

Jerald S. Feingold, Atty., Dept. of Labor, with whom Ann Rosenthal, Counsel, Appellate Litigation, Dept. of Labor, Washington, D.C., was on the brief for respondent. Cynthia L. Attwood, Atty., Dept. of Labor, Washington, D.C., also entered an appearance for respondent.

Timothy M. Biddle for intervenor, with whom Paul W. Reidl was on the brief for intervenor, Kaiser Coal Corp. in No. 86–1239, and with whom Susan E. Chetlin, Washington, D.C., was on the brief for intervenor, Utah Power & Light Co. in No. 86–1327.

Before BORK, SILBERMAN and FRIEDMAN,* Circuit Judges.

Opinion for the Court filed by Circuit Judge BORK.

BORK, Circuit Judge:

In each of these actions the petitioner, International Union, United Mine Workers of America ("UMWA"), challenges a decision of the Mine Safety and Health Administration ("MSHA") granting indefinite interim relief from operation of a mandatory safety standard pending a decision on a petition for modification of the safety standard. We find that the court has jurisdiction to review these challenges and that the interim relief regulation at issue is in excess of the Secretary of Labor's statutory authority under section 101(c) of the Federal Mine Safety and Health Act of 1977 ("the Mine Act"). We therefore grant the petitions for review.

### I.

The Mine Act is a comprehensive measure designed to regulate the mining industry. Titles II and III of the Act contain specific health and safety standards for underground coal mines. See 30 U.S.C. §§ 841–878 (1982). One of these standards provides that "[i]n any coal mine ... the entries used as intake and return aircourses shall be separated from belt haulage entries." Id. § 863(y).[1]

The Mine Act authorizes the Secretary of Labor to promulgate additional "mandatory health or safety standards for the protection of life and prevention of injuries in coal or other mines." 30 U.S.C. § 811(a) (1982). It also requires the Secretary to provide, without regard to the Administrative Procedure Act, "for an emergency temporary mandatory health or safety standard ... if he determines ... that miners are exposed to grave danger from exposure to substances or agents determined to be toxic or physically harmful, or to other hazards, and ... that such emergency standard is necessary to protect miners from such danger." Id. § 811(b).

Section 101(c) of the Mine Act, which is central to this case, authorizes the Secretary to grant mine-specific exemptions from mandatory standards. Upon the petition of a mine operator, or the representative of the miners, "the Secretary may modify the application of any mandatory safety standard to a coal or other mine if the Secretary determines that an alternative method of achieving the result of such

---

* Of the United States Court of Appeals for the Federal Circuit, sitting by designation pursuant to 28 U.S.C. § 291(a) (1982).

1. The MSHA has implemented this statutory requirement by regulation. See 30 C.F.R. § 75.-326 (1986). The "entries" referred to in the statute are tunnels used to transport miners, extracted coal, and air to and from the mine. An "intake aircourse" introduces fresh air into the mine. Air which has ventilated a working section of the mine is returned to the surface through a "return aircourse." "Belt entries" are tunnels which house conveyor belts used to transport the coal from the mine to the surface. Congress sought to separate the aircourses from the belt entries because there is a potential for fire on the belt conveyor. Intake air and return air coursed through the belt entry can fan a fire and intake air so coursed can carry products of the fire to the working area. See H.R.Rep. No. 761, 91st Cong., 1st Sess. 81 (1969), U.S.Code Cong. & Admin.News 1969, p. 2578.

standard exists which will at all times guarantee no less than the same measure of protection afforded the miners of such mine by such standard, or that the application of such standard to such mine will result in a dimunition of safety to the miners in such mine." 30 U.S.C. § 811(c) (1982).

Congress also addressed in section 101(c) the procedures that the Secretary must follow after a petition for modification has been filed. The Secretary must give notice of the petition and must conduct such investigation as he finds appropriate. The investigation must include an opportunity for a hearing of record upon the request of a mine operator, the representative of the miners, or other interested party. Before granting the petition, the Secretary must publish his findings and make them available to the operator or the representative of the miners. 30 U.S.C. § 811(c) (1982).

Section 101(d) of the Mine Act provides that "[a]ny person who may be adversely affected by a mandatory health or safety standard promulgated under this section may, at any time prior to the sixtieth day after such standard is promulgated," obtain judicial review. 30 U.S.C. § 811(d) (1982). The filing of a petition for review does not operate to stay the challenged mandatory standard. *Id.*

The Secretary has issued regulations governing the procedures used to implement the requirements of section 101(c). Upon receipt of a petition for modification, the MSHA publishes a notice of the petition in the Federal Register and interested parties have thirty days from the date of publication to file written comments. 30 C.F.R. § 44.12 (1986). The MSHA then conducts an investigation and, "[a]s soon thereafter as is practicable," the appropriate Administrator, here the Administrator for Coal Mine Safety and Health, issues a proposed decision. The decision is then served on the parties and, unless a party requests a hearing, becomes final in thirty days. *Id.* § 44.13. If a hearing is requested, the matter is referred to the Chief Administrative Law Judge for the Department of Labor and then assigned to an administrative law judge ("ALJ") for a hearing and a decision on the petition. *Id.* §§ 44.15, 44.-20. The proposed decision of the ALJ becomes final unless an appeal is filed with the Assistant Secretary of Labor for Mine Safety and Health ("the Assistant Secretary"). *Id.* § 44.33(a).

The proposed decision of the Administrator is not effective pending appeal to the ALJ and the proposed decision of the ALJ is not effective pending appeal to the Assistant Secretary. 30 C.F.R. § 44.50(a) (1986). A party may, however, petition for relief pending appeal of either decision. *Id.* § 44.50(b)(1). An application which seeks to implement an Administrator's decision must be filed with the ALJ and an application which seeks to implement an ALJ's decision must be filed with the Assistant Secretary. *Id.* § 44.50(b)(3). Relief pending appeal will be granted only if the applicant shows that "the requested relief will not adversely affect the health or safety of miners in the affected mine, and ... there is a substantial likelihood that the decision on appeal will be favorable to the applicant." *Id.* § 44.50(b)(6). Interlocutory appeal of a decision on an application for relief pending appeal is permitted only if the ALJ or the Assistant Secretary certifies that "the ruling involves an important question of law or policy as to which there are substantial grounds for difference of opinion, and ... an immediate appeal from the ruling may materially advance termination of the proceeding." *Id.* § 44.-50(b)(4).

In addition to relief pending appeal, a party may file an application "for interim relief from enforcement of a mandatory safety standard" at any time prior to a "final departmental decision on the petition for modification." 30 C.F.R. § 44.16(a) (1986). The application must be filed with and decided by the decisionmaker before whom the petition for modification is pending. *Id.* § 44.16(b). Parties have three days from receipt of the application to file written comments. *Id.* § 44.16(f). If the application is filed with and denied by the Administrator, the applicant may file a request with the Administrator for a hearing before an ALJ. *Id.* § 44.16(c). The re-

quest is then referred to the Chief Administrative Law Judge "for hearing and decision by an administrative law judge." *Id.* There is no provision for a hearing upon the grant of an application for interim relief. An application for interim relief will be granted only if the applicant "clearly show[s]" that

(1) the petition seeking modification has been filed in good faith, and the applicant is not using the proceeding solely to postpone or avoid abatement; (2) the requested relief will not adversely affect the health or safety of miners in the affected mine, and (3) there is a substantial likelihood that the decision on the merits of the petition for modification will be favorable to the applicant.

*Id.* § 44.16(e).

## II.

### A.

In No. 86–1239, Kaiser Coal Corporation ("Kaiser") petitioned the Secretary of Labor for modification of the mandatory safety standard that requires the separation of the return and intake aircourses from belt entries at its Upper York Canyon (Cimarron) Mine. Kaiser argued that a modification was necessary because compliance with the standard would require driving three entry tunnels which, because of ground conditions, would increase the likelihood of roof falls. Joint Appendix in No. 86–1239 ("No. 86–1239 J.A.") at 10. Kaiser asserted that use of a two-entry system would be significantly safer than the traditional three-entry system because it would improve roof stability. *Id.* at 10–16. Kai-

ser also claimed that its use of carbon monoxide monitoring systems and fire detection devices provides an alternative method of protection against the fire hazards created by using the belt entry as an aircourse. *Id.* at 16–18.[2] In response to Kaiser's petition, the MSHA began an investigation.

Approximately two months later, on July 2, 1985, Kaiser filed an application for interim relief from the mandatory standard and requested expedited consideration of the application. No. 86–1239 J.A. at 29–36. Kaiser requested permission to utilize a two-entry system pending a decision on its petition for modification and stated the same grounds for relief that it had proffered in the petition for modification. The UMWA filed written oppositions to the petition for modification and to the application for interim relief. The UMWA argued that the roof conditions at the Cimarron mine could effectively be controlled by other means and that the use of a two-entry system would increase concentrations of respirable dust and the potential for explosions and fire. *Id.* at 38–39. The UMWA also argued that the use of monitoring systems would not provide the same protection afforded by the existing standard. *Id.* at 39.

On September 27, 1985, the Administrator for Coal Mine Safety and Health granted Kaiser's application for interim relief but conditioned his decision on Kaiser's agreement to certain stipulations concerning the use of monitoring systems and other safety measures. No. 86–1239 J.A. at

2. A startling fact in this case is that Kaiser had been utilizing a two-entry system for 12 years at the time of its petition for modification. No. 86–1239 J.A. at 19. The Secretary, or a subordinate official, had approved the two-entry system, even though it did not comply with the mandatory safety standard, as part of Kaiser's ventilation plan. Brief for the Secretary of Labor in No. 86–1239 at 20 n. 7. Thus, the Secretary had implicitly granted a modification of the safety standard without regard to the procedures in § 101(c). In 1985, the Secretary, after an "internal review," changed his position and "determined that permission to utilize mining methods that did not comply with mandatory standards would no longer be granted in plan

approvals, but instead only through the petition for modification process." *Id.* The UMWA contends that the decision was made in response to the fire that occurred in 1984 at the Wilburg mine in Utah. Brief for Petitioner at 10. At the time of the fire, the mine employed a two-entry system under a plan approved by the MSHA. Affidavit of Danny C. Davidson at ¶¶ 8–9, No. 86–1239 J.A. at 140. The fire claimed the lives of 27 miners. *Id.* ¶ 9. This MSHA practice of modifying through plan approvals may explain why the MSHA had never granted interim relief pursuant to 30 C.F.R. § 44.16 in a contested modification proceeding prior to Kaiser's application.

103–08. The basis of the decision is contained in one paragraph:

> An investigation was conducted at your mine on July 23, 1985, and the results have been filed with the Chief, Division of Safety. Based on the investigation, the requested relief will not adversely affect health and safety of the miners and there is a substantial likelihood that a decision on the petition will be favorable provided that compliance is maintained with the provisions of the petition and the following additional stipulations.

*Id.* at 103. On November 14, 1985, Kaiser agreed to comply with the conditions. *Id.* at 159.

In response to the decision, the UMWA filed a request with the Administrator to revoke the grant of interim relief or, in the alternative, to stay the decision pending a hearing under 30 C.F.R. § 44.16(c). No. 86–1239 J.A. at 112–14. In the request, the UMWA noted that section 44.16(c) by its terms provides for a hearing only upon the denial of an application for interim relief, *id.* at 112–13, but urged the Administrator to construe the provision as providing the miners the same right to a hearing that is afforded mine operators upon the denial of an application. *Id.* at 113. The Administrator concluded that the UMWA's request required a legal interpretation and thus forwarded the request to the Chief Administrative Law Judge for assignment to an administrative law judge. *Id.* at 115.

On December 6, 1985, the ALJ dismissed the proceeding for lack of subject matter jurisdiction. No. 86–1239 J.A. at 174–80. The ALJ phrased the issue as whether the Office of Administrative Law Judges "has jurisdiction to entertain an appeal from a grant of interim relief while modification proceedings are still pending before the Administrator" and noted that the issue of whether the grant of interim relief survived an appeal of the Administrator's proposed decision was not before him. *Id.* at 175 & n. 2. The ALJ based his decision, however, on the fact that section 44.16(c) does not provide for a hearing upon a grant

of interim relief, *id.* at 176, and held that "[t]he Office of Administrative Law Judges has no inherent authority to conduct hearings upon matters not subject to a statutory requirement mandating a hearing on the record." *Id.* at 177. The ALJ then dismissed the proceedings.

The UMWA then filed an appeal with the Assistant Secretary requesting a stay of the Administrator's decision and an opportunity to appeal the Administrator's decision. No. 86–1239 J.A. at 181–87. On February 21, 1986, the Assistant Secretary dismissed the UMWA's appeal on the ground that section 44.16(c) "only provides for an appeal by the applicant from a *denial* of an application for interim relief." *Id.* at 208–09.

While this separate track of appeals was proceeding, the Administrator issued a proposed decision to grant Kaiser's petition for modification. The UMWA filed an appeal from the proposed decision and a request for a hearing. At the time of oral argument before this court, the matter had been set for a hearing in March 1987—one year and a half after the Administrator granted Kaiser's application for interim relief.

Because the proceedings had moved from the Administrator to the ALJ, the UMWA sent a letter to the Administrator regarding the status of the grant of interim relief. The UMWA reminded the Administrator that his position before the ALJ and before the Assistant Secretary had been that the interim relief would be effective only until he issued a proposed decision. No. 86–1239 J.A. at 212–13. The Administrator responded by stating his belief that all issues regarding the grant of interim relief were subject to review by the ALJ. *Id.* at 214. The Administrator also stated that "[d]uring the pendency of the UMWA's appeal, MSHA will continue to require Kaiser to abide by the terms of interim relief as granted, unless interim relief is modified by the judge." *Id.*[3] This petition for review followed.

---

3. At oral argument the court attempted to elicit the Secretary's position on the issues of whether the grant of interim relief survives the Administrator's proposed decision and whether the ALJ

## B.

The facts in No. 86–1327 are virtually identical to those discussed above. On August 23, 1985, Utah Power & Light Company ("UP & L") petitioned for modification of the mandatory safety standard requiring the separation of aircourses and belt entries at its Deer Creek and Cottonwood Mines. No. 86–1327 J.A. at 1–9. UP & L argued that application of the mandatory safety standard would increase the likelihood of roof falls. *Id.* at 2–3. At the same time, UP & L applied for interim relief. *Id.* at 10–14. The UMWA filed written oppositions to the petition and the request for relief. *Id.* at 15–20. On October 23, 1985, the Administrator granted the application with respect to the Deer Creek Mine [4] upon conditions similar to those imposed in No. 86–1239. *Id.* at 42–47. The Administrator's decision on the application provides:

> An investigation was conducted at your mine on September 18, 1985, and the results have been filed with the Chief, Division of Safety. Based on the investigation, the requested relief will not adversely affect health and safety of the miners and there is a substantial likelihood that a decision on the petition will be favorable provided that compliance is maintained with the provisions of the petition and the following additional stipulations.

*Id.* at 42. In response, the UMWA filed an appeal with the Assistant Secretary requesting a stay of the Administrator's decision and an opportunity to appeal that decision. *Id.* at 76. Three months later, the Assistant Secretary, citing his decision in the *Kaiser* case, dismissed the appeal on the ground "that there is no appeal right from the grant of interim relief in a modification proceeding." *Id.* at 91. Subsequently, the Administrator issued a proposed decision to grant the petition for modification. The UMWA filed an appeal and a request for a hearing. The hearing was set for March 1987.

## III.

In these petitions for review, the UMWA argues that section 44.16(c), which allows the Administrator to grant indefinite interim relief without an opportunity for a hearing, exceeds the Secretary's authority under section 101(c) of the Mine Act. We agree. Before we address the merits of petitioner's argument, however, we must address several challenges to our jurisdiction.

First, the Secretary argues that the court does not have jurisdiction pursuant to section 101(d), which grants jurisdiction to this court of final decisions, because "the grant of interim relief has never been reviewed by the Assistant Secretary on its merits." Brief for the Secretary of Labor in No. 86–1239 at 18. The first problem with this argument is that the Secretary will never reach a decision on the merits of the petition; the Secretary dismissed UMWA's appeal on the ground that section 44.16(c) does not provide jurisdiction to review the merits of a grant of interim relief. The second problem with this argument is that the issue of whether interim relief should have been granted on the facts of these two cases is not before the court. The issue before us is whether the Secretary has statutory authority to grant indefinite interim relief in any case. Counsel for the Secretary conceded at oral argument that the Secretary has issued a final decision with respect to this issue. That decision has permitted Kaiser and UP & L to utilize a two-entry system, in contravention of section 303(y) of the Mine Act, and perhaps, as the UMWA strenuously ar-

---

has the authority to modify the grant of interim relief. Counsel for the Secretary stated that the Secretary is not prepared to state his position on these issues. In the Secretary's brief on appeal, however, the Secretary states that it is his position that "since no effective review of the Administrator's grant of interim relief has ever been sought, the Secretary believes that interim relief remains in effect." Brief for the Secretary of Labor in No. 86–1239 at 42 n. 18. Because

there is no evidence to the contrary, we have proceeded on the assumption that the interim relief is still in effect.

4. On January 16, 1986, the Administrator denied UP & L's application with respect to the Cottonwood Mine. UP & L did not appeal this decision.

gues, at the miners' peril. In effect, the Administrator has granted a modification of the mandatory safety standard for the entire period of time that the petition is pending. There is no indication that the Secretary intends to reconsider this decision or to vacate the grant of interim relief. Thus, the Secretary's decision represents the final agency position on this issue, has the status of law, and has an immediate and direct effect on the parties. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 149–53, 87 S.Ct. 1507, 1515–17, 18 L.Ed.2d 681 (1967). Therefore, we have no difficulty concluding that the Secretary has issued a final decision in each of these two cases. *See Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.*, 333 U.S. 103, 113, 68 S.Ct. 431, 437, 92 L.Ed. 568 (1948); *National Air Carrier Ass'n v. CAB*, 436 F.2d 185, 191 (D.C.Cir. 1970) ("[T]he Board's description of interim approval as *'pendente lite'* should not be allowed to obscure the fact that [the] action taken ... operates with finality.").

■ The Secretary also argues that the UMWA has failed to exhaust its administrative remedies. Because the proceedings are now before the ALJ, the Secretary contends, the UMWA must again challenge the grant of interim relief before this ALJ and, if unsuccessful, must appeal this ALJ's decision to the Assistant Secretary. The premise of this argument is that the ALJ who is currently considering the mer-

its of the petition for modification "may well determine that he has the power to reexamine the question." Brief for the Secretary of Labor in No. 86–1239 at 23.

■ The UMWA has clearly exhausted its administrative remedies. The UMWA appealed to an ALJ the Administrator's decision to grant interim relief. The ALJ held that section 44.16(c) does not provide for review of a grant of interim relief. The UMWA appealed this decision to the Assistant Secretary, who also held that the UMWA has no right to appeal the decision pursuant to section 44.16(c). The fact that a second ALJ may choose to ignore the Assistant Secretary's interpretation of the regulation is not a ground for requiring the UMWA to go through the same proceedings it has previously exhausted. It is immaterial that the issue now would arise under section 44.50(b)(1) in the context of a petition for relief pending appeal from the Administrator's proposed decision instead of, as at the prior stage, as an attempt to appeal directly from the grant of interim relief. The exhaustion doctrine is a prudential concept designed to discourage the "frequent and deliberate flouting of administrative processes." *McKart v. United States*, 395 U.S. 185, 195, 89 S.Ct. 1657, 1663, 23 L.Ed.2d 194 (1969). We believe that the UMWA has indicated due respect for the processes it has attempted to utilize in its arduous journey to this court.[5]

5. Intervenors Kaiser and UP & L argue that the court does not have jurisdiction pursuant to § 101(d) because that provision by its terms grants a right to review only to "[a]ny person who may be adversely affected by a mandatory health or safety standard promulgated under this section," 30 U.S.C. § 811(d), and the orders under review do not adopt mandatory health or safety standards. The Secretary disagrees, and contends that § 101(d) gives the court jurisdiction of "final agency actions *relating to* mandatory health and safety standards." Brief for the Secretary of Labor in No. 86–1239 at 16 (emphasis added). This court has previously held that § 101(d) does not limit review to challenges to mandatory health and safety standards, but also includes within its terms challenges to agency actions which modify or amend those standards. *See Council of the Southern Mountains, Inc. v. Donovan*, 653 F.2d 573, 579–80 n. 26 (D.C.Cir.1981) (decision to defer implementation of regulations is in effect an amendment to

a mandatory safety standard for which § 101(d) implicitly authorizes review). Thus, because the Secretary acted pursuant to § 101(c) in promulgating the regulation at issue, and because the Administrator's decision is in effect a modification of a mandatory safety standard, this court has jurisdiction pursuant to § 101(d).

Kaiser and UP & L also argue that the grant of interim relief is in effect a decision not to enforce a mandatory safety standard and thus under the Supreme Court's reasoning in *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), is presumptively immune from judicial review. First, this argument does not comport with the facts of this case. The Secretary did not decide not to institute enforcement proceedings against Kaiser and UP & L. The Secretary acted pursuant to § 101(c) to grant a temporary modification of a mandatory safety standard pending a final decision on a petition for modification. If the Secretary ultimately decides to deny the petition for modifi-

## IV.

We must now determine whether the Secretary's interim relief regulation is consistent with the statutory provision which it seeks to implement. We find that it is not. Instead, we conclude that section 44.16(c), as interpreted by the Secretary, is inconsistent with the language, structure, legislative history, and policy of the Mine Act.

As a preliminary matter, we must determine how the Secretary has interpreted section 44.16(c). The Secretary argues that this case presents the issue of whether the Secretary has an implied power to grant temporary interim relief when the duration of the interim relief "will usually be quite short," Brief for the Secretary of Labor in No. 86–1239 at 35, and when the Secretary has "carefully limited the scope of interim relief to no more than what is required to effectively implement Section 101(c)." *Id.* at 32–33. This is, however, not the issue that is presented on the facts of these cases. The interim relief granted in these two cases clearly is not of short duration and the Secretary has not in any way limited the indefinite grant of interim relief. The Secretary has, in effect, granted a modification of a mandatory safety standard for the entire period that the petition for modification is pending. At the time of oral argument in these cases, the "interim relief" had been in effect for approximately one and a half years in each case and

neither case had yet been heard by an ALJ. Thus, the fact is that the "interim relief" granted under section 44.16 will last for years, is not necessary to the Secretary's ultimate decision under section 101(c), is not based upon the statutory criteria in section 101(c), and is not in any way an attempt by the Secretary to provide a short-term remedy to prevent frustration of a statutory mandate. *Compare American Trucking Ass'ns v. United States,* 344 U.S. 298, 311, 73 S.Ct. 307, 315, 97 L.Ed. 337 (1953) (regulatory agencies have inherent authority to promulgate rules "aimed at conditions which may directly frustrate the success of the regulation undertaken by Congress"); *Pan American World Airways, Inc. v. CAB,* 684 F.2d 31, 46–48 (D.C.Cir.1982) (CAB may grant temporary emergency exemption only if relief is "limited to no more than is necessary to meet the crisis"); *National Air Carrier Ass'n,* 436 F.2d at 191 (agency has inherent authority to grant interim approval if necessary to meet mandate to protect the public interest and if based upon "a careful balancing of the gravity and duration of the harm likely to be inflicted upon the protesting parties against the benefits flowing from approval for the short period"); *Pennsylvania Gas & Water Co. v. FPC,* 427 F.2d 568, 576 (D.C.Cir.1970) ("only a narrow class of real 'emergency' cases justifies the taking of action such as temporary certificates on an informal examination of the file without opportunity for hearing").[6]

cation, the Secretary is free to institute enforcement proceedings against Kaiser and UP & L pursuant to § 105 of the Mine Act, 30 U.S.C. § 815 (1982). Second, none of the factors which led to the Court's decision in *Chaney* are relevant here. The Administrator's decision to grant interim relief did not require a determination of "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, ... [or] whether the agency has enough resources to undertake the action at all." *Chaney,* 470 U.S. at 831, 105 S.Ct. at 1656. Furthermore, in this action, the Administrator clearly has "exercised its power in some manner" such that "[t]he action at least can be reviewed to determine whether the agency exceeded its statutory powers." *Id.* at 832, 105 S.Ct. at 1656. Finally, even if the presumption of unreviewability applies, it has been over-

come by Congress' provision in § 101(c) of "guidelines for the agency to follow in exercising its enforcement powers." *Id.* at 833, 105 S.Ct. at 1656.

**6.** We do not decide, therefore, whether the Secretary would have authority to grant interim relief from a mandatory safety standard when there is a possibility that application of the standard will increase the danger to the miners. Nor do we decide whether the Secretary would have this authority in an "emergency" situation. Because the basic purpose of the Mine Act is to protect the miner, 30 U.S.C. § 801 (1982), this type of situation would present a more difficult issue. Section 44.16(c), however, by its terms is not meant to address this type of situation. The only finding regarding the safety of the miner that is required by § 44.16(c) is that "the requested relief will not adversely affect the health or safety of miners in the affected mine."

The real issue in this case is whether the Secretary may grant a modification of a mandatory safety standard, without regard to the requirements of section 101(c) of the Mine Act, without an opportunity for a hearing, upon three days' notice to the affected miners, over the opposition of those miners, on the basis of a one-paragraph explanation which does nothing more than paraphrase the challenged regulation, and with no provision for a right to appeal that decision. We think not.

Because the regulation at issue is an administrative interpretation of the statute the Secretary administers, we are faced with two questions. First we must determine whether Congress has addressed the precise issue in question. If so, we must give effect to the "unambiguously expressed intent of Congress." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). If, however, the statute is either silent or ambiguous with respect to the precise issue, we must affirm an agency interpretation if it is based on a "permissible construction of the statute," *id.* at 843, 104 S.Ct. at 2782, and if it represents a "reasonable policy choice." *Id.* at 845, 104 S.Ct. at 2783.

In reviewing the Mine Act to determine congressional intent, we begin with the recognition that:

> The primary purpose of the ... Act was to protect mining's most valuable resource—the miner.... In the first section of the Act Congress noted the "urgent need to provide more effective means and measures for improving the working conditions and practices in the Nation's coal mines in order to prevent death and serious physical harm".... In order to achieve these goals, Congress intended the Act to be liberally construed.

*International Union, United Mine Workers of Am. v. Kleppe,* 532 F.2d 1403, 1405–06 (D.C.Cir.), *cert. denied,* 429 U.S. 858, 97 S.Ct. 157, 50 L.Ed.2d 135 (1976); *accord Freeman Coal Mining Co. v. Interior Bd.*

*of Mine Operations Appeals,* 504 F.2d 741, 744 (7th Cir.1974); *Phillips v. Interior Bd. of Mine Operations Appeals,* 500 F.2d 772, 782 (D.C.Cir.1974), *cert. denied,* 420 U.S. 938, 95 S.Ct. 1149, 43 L.Ed.2d 415 (1975); *Reliable Coal Corp. v. Morton,* 478 F.2d 257, 262 (4th Cir.1973); *St. Marys Sewer Pipe Co. v. Bureau of Mines,* 262 F.2d 378, 381 (3d Cir.1959). Thus, we must determine whether the interim relief regulation is consistent with section 101(c) of the Mine Act in light of the protections afforded miners in that section.

The language of section 101(c) indicates that Congress did not intend to permit the Secretary to grant a modification of a mandatory safety standard, for any period of time, except after notice and an opportunity for a hearing and upon a finding by the Secretary that an alternative method exists "which will at all times guarantee no less than the same measure of protection afforded the miners of such mine by such standard" or that application of the standard "will result in a diminution of safety to the miners in such mine." 30 U.S.C. § 811(c) (1982). In addition to the fact that there is no language in section 101(c) authorizing the Secretary to grant interim relief, we cannot identify any language in the section that could be interpreted as permitting some "implied authority" to grant such relief. Instead, the language is clear, mandatory, and specific. The interim relief regulation is not related to, and does not take account of, this clear language in any respect. The regulation does not require the Secretary to make either finding required by section 101(c). The regulation also omits the miners' right to a hearing under section 101(c) and allows the miners a mere *three* days to respond to the application. The regulation is thus inconsistent with every protection afforded the miners under section 101(c).

The absence of any stated authority in section 101(c) to grant interim relief is itself significant because Congress explicitly granted such authority in other provisions of the Mine Act. Of greatest importance is

---

The regulation does not require a finding that interim relief is necessary because application of the standard will adversely affect the health or safety of miners.

the fact that Congress in section 101(b) authorized the Secretary to provide for emergency temporary mandatory standards, without regard to the requirements of the APA, upon a finding "that miners are exposed to grave danger from exposure to substances or agents determined to be toxic or physically harmful, or to other hazards, and ... that such emergency standard is necessary to protect miners from such danger." 30 U.S.C. § 811(b) (1982). Thus, Congress considered the question of whether the Secretary should have authority to grant temporary relief under section 101 and determined that the Secretary should have this authority to impose industry-wide mandatory safety standards. Congress further limited this authority by requiring the Secretary to make findings, all of which relate to the safety of the miners. Congress did not grant similar authority with respect to "mine-specific" standards under section 101(c). This is strong evidence that Congress did not intend to allow the Secretary to grant temporary relief from mandatory safety standards pursuant to section 101(c). *See Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) ("'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'"), *quoting United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir.1972); *Saxon v. Georgia Ass'n of Indep. Ins. Agents*, 399 F.2d 1010, 1014 (5th Cir.1968) ("a power which has been withheld or denied by Congress cannot be found to exist as an 'incidental' and 'necessary' power" when Congress has specifically delineated other powers); *City of Burbank v. General Elec. Co.*, 329 F.2d 825, 832 (9th Cir.1964) ("where Congress has carefully employed a term in one place and

excluded it in another, it should not be implied where excluded").

This finding is buttressed by Congress's explicit provision for temporary relief in other parts of the Mine Act. Under section 105(b)(2), a mine operator may obtain temporary relief from the operation of a withdrawal order [7] but only if "a hearing has been held in which all parties were given an opportunity to be heard; ... the applicant shows that there is substantial likelihood that the findings of the Commission will be favorable to the applicant; and ... such relief will not adversely affect the health and safety of miners." 30 U.S.C. § 815(b)(2) (1982). The provision also explicitly provides that no temporary relief shall be granted from certain other orders issued under section 104 of the Mine Act. *Id.* Thus, again Congress specifically provided for temporary relief from the enforcement of withdrawal orders—which are issued in response to violations of mandatory health and safety standards—and specifically delineated the procedures the Secretary must employ before granting such relief. Congress did not authorize the Secretary to grant temporary relief when a mine operator is in violation of those standards because the operator has also filed a petition for modification of those standards. Had Congress intended such a result it could easily have added language to section 101(c) similar to that found in section 105(b). *See United States v. Naftalin*, 441 U.S. 768, 773–74, 99 S.Ct. 2077, 2081–82, 60 L.Ed.2d 624 (1979) ("Respondent nonetheless urges that the phrase, ... found only in [two] subsection[s], should be read into all three subsections. The short answer is that Congress did not write the statute that way.").

Finally, any party may obtain temporary relief pending judicial review of a decision of the Federal Mine Safety and Health Review Commission upon a finding by the

---

7. A "withdrawal order" is an order issued after a finding that a mine operator is in violation of a mandatory health or safety standard and that the violation has not been totally abated within the time period specified by the Secretary. *See* 30 U.S.C. § 814 (1982). The withdrawal order requires the mine operator "to immediately

cause all persons, except [certain designated persons], to be withdrawn from, and to be prohibited from entering, [the affected] area until an authorized representative of the Secretary determines that such violation has been abated." *Id.* § 814(b).

court that "all parties to the proceeding have been notified and given an opportunity to be heard on a request for temporary relief; ... the person requesting such relief [has] show[n] that there is a substantial likelihood that he will prevail on the merits of the final determination of the proceeding; and ... [that] such relief will not adversely affect the health and safety of miners in the coal or other mine." 30 U.S.C. § 817(a)(2) (1982).

These provisions show that Congress clearly considered the issue of temporary relief and clearly delineated the circumstances under which such relief is authorized. By negative implication, this is strong evidence that Congress did not intend to authorize the Secretary to grant temporary relief from mandatory health and safety standards as a matter of course under section 101(c).[8] Thus, the interim relief regulation is contrary to the clear congressional intent as expressed in the language of the Mine Act.

There is also no support in the legislative history of section 101(c) for the Secretary's position. None of the congressional reports mentions any authority to grant interim relief from a mandatory health or safety standard. *See* S.Rep. No. 181, 95th Cong., 1st Sess. 25–26 (1977), U.S.Code Cong. & Admin.News 1977, pp. 3401, 3425, 3426; S.Conf.Rep. No. 461, 95th Cong., 1st Sess. 42–43 (1977); *see also* H.R.Conf.Rep. No. 761, 91st Cong., 1st Sess. 78–79 (1969) (explanation of parallel provision in the Federal Coal Mine Health and Safety Act of 1969). The legislative history does, however, provide additional evidence that Congress did not intend to grant the Secretary authority to grant interim relief from a mandatory safety standard pursuant to section 101(c).

Both the original House bill and the original Senate bill contained a provision which would have allowed a mine operator to obtain temporary relief from a mandatory standard upon a showing that

(A) he is unable to comply with a standard by its effective date because of unavailability of professional or technical personnel or of materials and equipment needed to come into compliance with the standard or because necessary construction or alteration of facilities cannot be completed by the effective date, (B) he will guarantee that employees are afforded no less than the same measure of protection they would have been provided by such standard, and (C) he has an effective program for coming into compliance with the standard as quickly as practicable.

S. 717, 95th Cong., 1st Sess. § 102(d)(1), 123 Cong.Rec. 4391 (1979); H.R. 4287, 95th Cong., 1st Sess. § 2 (1977), *reprinted in A Legislative History of the Federal Mine Safety and Health Act of 1977*, at 200–02 (1978) ("*1977 Leg. Hist.*"). These bills also provided that a temporary order could be granted only after notice to employees and an opportunity for a public hearing, and, further, that the order could be in effect no longer than necessary to achieve compliance or for six months, whichever was shorter. 123 Cong.Rec. 4391 (1977); *1977 Leg. Hist.*, at 200–01. This provision, however, was omitted by the House and Senate committees to whom the bills were referred. Similar provisions were proposed as amendments on the floor of the House and of the Senate. *See* 123 Cong.Rec. 19,993–94 (1977); 123 Cong.Rec. 23,168 (1977). These proposals were also rejected. Thus Congress considered proposals which would have authorized the Secretary to grant temporary relief from mandatory standards and rejected them. Again, we find this to be evidence of congressional intent to preclude such authority.[9]

---

**8.** Again, we do not decide whether the Secretary has inherent power to grant interim relief if essential to further the purposes of the Mine Act or under other compelling circumstances. *See supra* p. 617 & note 6.

**9.** The Secretary asserts that Congress authorized the Secretary to grant interim relief under § 101(c) of the Mine Act when it did not reject

the Interior Board of Mine Operations' interpretation of § 301(c) of the Coal Act, the predecessor provision to § 101(c), as containing an implied grant of power to allow interim relief. Brief for the Secretary of Labor in No. 86–1239 at 26–28. First, in the decision cited by the Secretary, the Interior Board of Mine Operations did not adopt the procedures for interim

The foregoing demonstrates that Congress carefully considered the question of the Secretary's authority to grant interim relief and explicitly provided that authority for specific parts of the Mine Act and under specific conditions. We can discern no reason why Congress withheld this explicit authority in section 101(c) except that it intended to do just that. Thus, we must conclude that the omission expresses "the desire to achieve disparate results," *Carter v. Director, Office of Workers' Compensation Programs*, 751 F.2d 1398, 1401 (D.C. Cir.1985), and that the Secretary's interim relief regulation is contrary to this clear congressional intent. We therefore grant the petitions for review and vacate the orders in these two cases awarding interim relief.

*It is so ordered.*

relief that the Secretary has adopted in the regulation under review. In Gateway Coal Co., 79 Interior Dec. 102 (1972), the Interior Board found that interim relief could be granted only after a hearing and upon a showing that the operator would suffer irreparable harm if interim relief were not granted. *Id.* at 106. Neither requirement has been adopted by the Secretary.

Second, there is no evidence that Congress was aware of this decision when it passed the Mine Act. Thus, the Secretary's argument fails. *See Zuber v. Allen*, 396 U.S. 168, 185–86 n. 21, 90 S.Ct. 314, 324 n. 21, 24 L.Ed.2d 345 (1969); *Coalition to Preserve the Integrity of Am. Trademarks v. United States*, 790 F.2d 903, 917 (D.C. Cir.1986).