# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Decided July 3, 2017

No. 17-1145

CLEAN AIR COUNCIL, ET AL.,
PETITIONERS

v.

E. SCOTT PRUITT, ADMINISTRATOR, ENVIRONMENTAL
PROTECTION AGENCY AND ENVIRONMENTAL PROTECTION
AGENCY,
RESPONDENTS

AMERICAN PETROLEUM INSTITUTE, ET AL.,
INTERVENORS

———

On Emergency Motion For A Stay Or,
In the Alternative, Summary Vacatur

———

*Susannah L. Weaver*, *Sean H. Donahue*, *David Doniger*, *Meleah Geertsma*, *Tim Ballo*, *Joel Minor*, *Adam Kron*, *Peter Zalzal*, *Alice Henderson*, *Vickie Patton*, *Tomás Carbonell*, *Andres Restrepo*, *Joanne Marie Spalding*, *Ann Brewster Weeks*, and *Darin Schroeder* were on the emergency motion for a stay or, in the alternative, summary vacatur and reply to responses in opposition to emergency motion for a stay or, in the alternative, summary vacatur.

*Jeffrey H. Wood*, Acting Assistant Attorney General, U.S. Department of Justice, and *Benjamin Carlisle*, Attorney, were on EPA's opposition to petitioners' emergency motion for a stay or, in the alternative, summary vacatur.

*William L. Wehrum*, *Felicia H. Barnes*, *Stacy R. Linden*, *John Wagner*, *Samuel B. Boxerman*, *Joel F. Visser*, *Sandra Y. Snyder*, *James D. Elliott*, *Shannon S. Broome*, *Charles H. Knauss*, and *John R. Jacus* were on the industry intervenor-respondents' response in opposition to petitioners' emergency motion for a stay or, in the alternative, summary vacatur.

Before: TATEL, BROWN, and WILKINS, *Circuit Judges*.

Opinion for the Court filed PER CURIAM.

Dissenting Opinion filed by *Circuit Judge* BROWN.

PER CURIAM: Petitioners, a group of environmental organizations, challenge the Environmental Protection Agency's decision to stay implementation of portions of a final rule concerning methane and other greenhouse gas emissions. For the reasons set forth in this opinion, we conclude that EPA lacked authority under the Clean Air Act to stay the rule, and we therefore grant petitioners' motion to vacate the stay.

**I.**

In June 2016, EPA Administrator Gina McCarthy issued a final rule establishing "new source performance standards" for fugitive emissions of methane and other pollutants by the oil and natural gas industries. 81 Fed. Reg. 35,824 (June 3, 2016).

The methane rule took effect on August 2, 2016, *id.*, and required regulated entities to conduct an "initial monitoring survey" to identify leaks by June 3, 2017, 40 C.F.R. § 60.5397a(f).

After EPA published the rule, several industry groups—including the American Petroleum Institute (API), the Texas Oil and Gas Association (TXOGA), and the Independent Petroleum Association of America (IPAA)—filed administrative petitions seeking reconsideration under section 307(d)(7)(B) of the Clean Air Act (CAA). 42 U.S.C. § 7607(d)(7)(B); *see also* 82 Fed. Reg. 25,731 (June 5, 2017). That provision sets forth the circumstances under which EPA *must* reconsider a rule. It provides that "[i]f the person raising an objection can demonstrate to the Administrator that [1] it was impracticable to raise such objection within [the notice and comment period] . . . and [2] if such objection is of central relevance to the outcome of the rule, the Administrator *shall* convene a proceeding for reconsideration of the rule . . . ." 42 U.S.C. § 7607(d)(7)(B) (emphasis added). The statute also provides that the "effectiveness of the rule may be stayed during such reconsideration, however, by the Administrator or the court for a period not to exceed three months." *Id.* The industry associations argued that CAA section 307(d)(7)(B) required EPA to reconsider the final rule because several of its provisions "were not included in the proposed rule and . . . [they were therefore unable] to raise an objection during the public comment period." *See, e.g.*, API, Request for Administrative Reconsideration of EPA's Final Rule "Oil and Natural Gas Sector: Emission Standards for New, Reconstructed, and Modified Sources," at 1 (Aug. 2, 2016) ("API Reconsideration

Request"). They also sought a stay "pending reconsideration." *Id.*

By letter dated April 18, 2017, the Administrator, now Scott Pruitt, stated that EPA "[found] that the petitions have raised at least one objection to the fugitive emissions monitoring requirements" that warrants reconsideration "under 307(d)(7)(B) of the CAA." Letter from E. Scott Pruitt to Howard J. Feldman, Shannon S. Broome, James D. Elliott, & Matt Hite, Convening a Proceeding for Reconsideration, at 2 (Apr. 18, 2017). Accordingly, the Administrator announced, "EPA is convening a proceeding for reconsideration" of two specific provisions of the methane rule. *Id.* The letter also stated that "EPA intend[ed] to exercise its authority under CAA section 307 to issue a 90-day stay of the compliance date" for the fugitive emissions requirements. *Id.*

On June 5—just two days after the deadline for regulated parties to conduct their first emissions surveys and begin repairing leaks, *see* 40 C.F.R. § 60.5397a(f)—EPA published a "[n]otice of reconsideration and partial stay" in the Federal Register, 82 Fed. Reg. at 25,730. Relying on CAA section 307(d)(7)(B), EPA granted reconsideration on four aspects of the methane rule: (1) the decision to regulate low-production wells, (2) the process for proving compliance by "alternative means," (3) the requirement that a professional engineer certify proper design of vent systems, and (4) the decision to exempt pneumatic pumps from regulation only if a professional engineer certified that it was "technically infeasible" to route such pumps "to a control device or a process." 82 Fed. Reg. at 25,731–32. In addition, the notice "stay[ed] the effectiveness of the fugitive emissions requirements, the standards for

pneumatic pumps at well sites, and the certification by a professional engineer requirements" for 90 days "pending reconsideration." 82 Fed. Reg. at 25,732. The notice explained that the stay had gone into effect on June 2, 2017—that is, three days before the notice was published in the Federal Register. 82 Fed. Reg. at 25,731.

On June 16, EPA published a notice of proposed rulemaking (NPRM) announcing its intention to extend the stay "for two years" and to "look broadly at the entire 2016 Rule" during "the reconsideration proceeding." 82 Fed. Reg. 27,645 (June 16, 2017). Comments on that NPRM are due July 17, or if any party requests a hearing, by August 9. *Id.*

After EPA suspended implementation of the methane rule, six environmental groups—Environmental Defense Fund, Natural Resources Defense Council, Environmental Integrity Project, Earthworks, Clean Air Council, and Sierra Club—filed in this court an "emergency motion for a stay or, in the alternative, summary vacatur." According to Environmental Petitioners, EPA's stay violates CAA section 307(d)(7)(B) because "all of the issues Administrator Pruitt identified could have been, *and actually were*, raised (and extensively deliberated) during the comment period." Environmental Petitioners' Mot. 5 (emphasis in original). EPA opposes the motion, as do intervenors, a group of oil and gas associations including API, IPAA, and TXOGA. Together, they argue that we lack jurisdiction to review the stay, and that even if it were justiciable, the stay is lawful. We consider these arguments in turn.

**II.**

We begin with jurisdiction. Both EPA and Industry Intervenors argue that an agency's decision to grant reconsideration of a rule is unreviewable because it does not constitute "final action" under 42 U.S.C. § 7607(b)(1). EPA Opp. 8; Intervenors' Opp. 6. Industry Intervenors argue that for the same reason we lack jurisdiction to review the stay. Intervenors' Opp. 8.

It is true that an agency's decision to grant a petition to reconsider a regulation is not reviewable final agency action. *See Portland Cement Association v. EPA*, 665 F.3d 177, 185 (D.C. Cir. 2011) (noting that review is available "if reconsideration is *denied*" (emphasis added)). To be "final," agency action must "mark the consummation of the agency's decisionmaking process" and "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations and internal quotation marks omitted). By itself, EPA's decision to grant reconsideration, which merely begins a process that could culminate in no change to the rule, fails this test.

The imposition of the stay, however, is an entirely different matter. By staying the methane rule, EPA has not only concluded that section 307(d)(7)(B) requires reconsideration, but it has also suspended the rule's compliance deadlines. EPA's stay, in other words, is essentially an order delaying the rule's effective date, and this court has held that such orders are tantamount to amending or revoking a rule. As we explained in a very similar situation, where an agency granted an application

for interim relief from a safety standard while it reconsidered that standard: "In effect, the Administrator has granted a modification of the mandatory safety standard for the entire period of time that the petition is pending. There is no indication that the Secretary intends to reconsider this decision or to vacate the grant of interim relief. Thus, the Secretary's decision represents the final agency position on this issue, has the status of law, and has an immediate and direct effect on the parties. Therefore, we have no difficulty concluding that the Secretary has issued a final decision . . . ." *International Union, United Mine Workers of America v. Mine Safety & Health Administration*, 823 F.2d 608, 614–15 & n.5 (D.C. Cir. 1987) (citation omitted); *see also Environmental Defense Fund, Inc. v. Gorsuch*, 713 F.2d 802, 813 (D.C. Cir. 1983) ("[S]uspension of the permit process . . . amounts to a suspension of the effective date of regulation . . . and may be reviewed in the court of appeals as the promulgation of a regulation."); *Council of Southern Mountains, Inc. v. Donovan*, 653 F.2d 573, 579 nn.26 & 28 (D.C. Cir. 1981) (rejecting the argument that the court lacked jurisdiction to review an order "defer[ring] the implementation of regulations").

In addition to "mark[ing] the consummation of . . . [EPA's] decisionmaking process" with respect to the final rule's effective date, the stay also affects regulated parties' "rights or obligations." *Bennett*, 520 U.S. at 178 (citation and internal quotation marks omitted). Absent the stay, regulated entities would have had to complete their initial monitoring surveys by June 3 and repair any leaks within thirty days. *See* 40 C.F.R. § 60.5397a(f), (h). Failure to comply with these requirements could have subjected oil and gas companies to civil penalties, citizens' suits, fines, and imprisonment. *See* 42 U.S.C.

§ 7413(b)-(d) (providing for civil and criminal penalties for failure to comply with emissions rules); *id.* § 7604(a) (authorizing citizens' suits for alleged violations of emissions standards); 40 C.F.R. § 19.4 (establishing the schedule of fines for CAA violations). The stay—which EPA made retroactive to one day *before* the June 3 compliance deadline—eliminates that threat, *see* 82 Fed. Reg. at 25,731, and thus relieves regulated parties of liability they would otherwise face.

The dissent draws a sharp distinction between the denial of a stay, which would have required regulated entities to comply with the rule, and the imposition of the stay, which erased that obligation. As the dissent sees it, only forced compliance has "obvious consequences" for regulated parties. Dissent at 5. But this one-sided view of final agency action ignores that, by staying the rule's effective date and its compliance duties, EPA has determined "rights or obligations . . . from which legal consequences will flow." *Bennett*, 520 U.S. at 178. The dissent's view is akin to saying that incurring a debt has legal consequences, but forgiving one does not. A debtor would beg to differ.

The dissent also stresses that EPA's proceedings concerning the methane rule are ongoing. Dissent at 3; *see* 82 Fed. Reg. at 27,645; 82 Fed Reg. 27,641 (June 16, 2017). But as we have explained, "the applicable test is not whether there are further administrative proceedings available, but rather whether the impact of the order is sufficiently final to warrant review in the context of the particular case." *Friedman v. FAA*, 841 F.3d 537, 542 (D.C. Cir. 2016) (quoting *Environmental Defense Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 591 (D.C. Cir. 1971)). Here, because the stay relieves regulated parties of

any obligation to meet the June 3 deadline—indeed EPA has proposed to extend the stay for years, *see* 82 Fed. Reg. at 27,645—the "order is sufficiently final to warrant review," *Friedman*, 841 F.3d at 542. *Cf. Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436 (D.C. Cir. 1986) ("Once the agency publicly articulates an unequivocal position . . . and expects regulated entities to alter their primary conduct to conform to that position, the agency has voluntarily relinquished the benefit of postponed judicial review.").

EPA's argument that courts have no authority to review CAA section 307(d)(7)(B) stays is also at odds with the statute's language. Section 307(d)(7)(B) authorizes not only the Administrator, but also *courts* to stay a final rule. 42 U.S.C. § 7607(d)(7)(B) (authorizing "the Administrator or the court" to issue a three-month stay). Given that Congress granted this court the power to enter a stay, it seems quite anomalous that it did not also confer upon us the lesser power to review the Administrator's decision to issue a stay.

Indeed, EPA's reading would have the perverse result of empowering this court to act when the agency denies a stay but not when it chooses to grant one. Under section 307(d)(7)(B), if EPA had granted reconsideration but declined to impose a stay, the industry groups could have come to this court seeking a stay. *See Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 558 (D.C. Cir. 2015) (declining to grant a stay during the pendency of a reconsideration proceeding because petitioners had failed to demonstrate irreparable harm). Yet, in EPA's view, where, as here, it grants reconsideration *and imposes a stay*, we have no power to hear the case. Nothing in section 307—or any other provision cited by the parties or the

dissent—suggests that this court's jurisdiction turns on whether EPA grants as opposed to denies a stay.

EPA and Industry Intervenors argue that Environmental Petitioners' motion amounts to a collateral attack on the underlying reconsideration proceeding. *See also* Dissent at 4. But CAA section 307(d)(7)(B) expressly links EPA's power to stay a final rule to the two requirements for mandatory reconsideration, *i.e.*, that it was "impracticable to raise" an objection during the public comment period and the objection is "of central relevance to the outcome of the rule." Only when these two conditions are met does the statute authorize the Administrator to stay a lawfully promulgated final rule. Accordingly, to determine whether the stay was lawful—that is, to assess EPA's final action—we must consider whether the agency met the statutory requirements for reconsideration. In other words, although absent a stay we would have no authority to review the agency's decision to grant reconsideration, because EPA chose to impose a stay suspending the rule's compliance deadlines, we must review its reconsideration decision to determine whether the stay was authorized under section 307(d)(7)(B).

## III.

Environmental Petitioners seek two types of relief: a "judicial stay" of EPA's administrative stay, and in the alternative, "summary disposition and vacatur" of EPA's stay "because the stay is clearly unlawful." Environmental Petitioners' Mot. 1. To consider the former, we would have to assess Environmental Petitioners' motion under the four-factor standard for a stay pending judicial review: "(1) whether the

stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citation omitted).

For reasons explained below, however, we agree with Environmental Petitioners that the 90-day stay was unauthorized by section 307(d)(7)(B) and was thus unreasonable. Accordingly, we have no need to consider the criteria for a stay pending judicial review. *Cf. United States Association of Reptile Keepers, Inc. v. Zinke*, 852 F.3d 1131, 1135 (D.C. Cir. 2017) ("When . . . the ruling under review rests solely on a premise as to the applicable rule of law, and the facts are established or of no controlling relevance, we may resolve the merits even though the appeal is from the entry of a preliminary injunction." (citation and internal quotation marks omitted)). We shall therefore vacate the stay as "arbitrary, capricious, [and] in excess of statutory . . . authority." 42 U.S.C. § 7607(d)(9)(A), (C).

## A.

Defending the stay, EPA repeatedly invokes its "broad discretion" to reconsider its own rules. EPA Opp. 6. Agencies obviously have broad discretion to reconsider a regulation at any time. To do so, however, they must comply with the Administrative Procedure Act (APA), including its requirements for notice and comment. 5 U.S.C. § 553; *see Perez v. Mortgage Bankers Association*, 135 S. Ct. 1199, 1206 (2015) ("[T]he D.C. Circuit correctly read § 1 of the APA to

mandate that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance."). As we have explained, "an agency issuing a legislative rule is itself bound by the rule until that rule is amended or revoked" and "may not alter [such a rule] without notice and comment." *National Family Planning and Reproductive Health Association, Inc. v. Sullivan*, 979 F.2d 227, 234 (D.C. Cir. 1992).

EPA argues that it nonetheless has "inherent authority" to "issue a brief stay" of a final rule—that is, not to enforce a lawfully issued final rule—while it reconsiders it. *See* EPA Opp. 6, 10, 13. This argument suffers from two fundamental flaws.

First, EPA cites nothing for the proposition that it has such authority, and for good reason: as we have made clear, it is "axiomatic" that "administrative agencies may act only pursuant to authority delegated to them by Congress." *Verizon v. FCC*, 740 F.3d 623, 632 (D.C. Cir. 2014) (alteration and citations omitted); *see Natural Resources Defense Council v. Abraham*, 355 F.3d 179, 202 (2d Cir. 2004) (rejecting the contention that the Department of Energy had "inherent power" to suspend a duly promulgated rule where no statute conferred such authority and contrasting the Energy Policy and Conservation Act with the reconsideration provision in the Clean Air Act at 42 U.S.C. § 7607(d)(7)(B)). Accordingly, EPA must point to something in either the Clean Air Act or the APA that gives it authority to stay the methane rule, and as we explain below, the only provision it cites—CAA section 307(d)(7)(B)—confers no such authority.

Second, when EPA granted reconsideration and imposed the stay of the methane rule, it did not rely on its so-called inherent authority. *See Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("[A] reviewing court . . . must judge the propriety of [agency] action solely by the grounds invoked by the agency" when it acted). Instead, EPA expressly acted "pursuant to section 307(d)(7)(B) of the CAA," 82 Fed. Reg. at 25,732, which clearly delineates when stays are authorized. As noted above, that section empowers EPA to stay a final rule if a petitioner demonstrates impracticability and central relevance, the two requirements for mandatory reconsideration.

EPA insists that "the statutory text [of section 307] suggests that Congress did not intend to cabin EPA's authority to issue a stay to only those circumstances where EPA is *mandated* to convene reconsideration proceedings . . . ." EPA Opp. 12 (emphasis in original). The language of section 307(d)(7)(B) is to the contrary: it authorizes the agency to grant a stay during "such reconsideration," a term that quite obviously refers back to the reconsideration that EPA "shall" undertake when someone presents an objection of "central relevance" that was "impracticable" to raise during the period for public comment. 42 U.S.C. § 7607(d)(7)(b).

## B.

Under CAA section 307(d)(7)(B), then, the stay EPA imposed is lawful only if reconsideration was mandatory. Accordingly, the question before us is whether the industry groups that sought a stay of the methane rule met the two requirements for mandatory reconsideration.

The parties disagree about the appropriate standard of review for considering this issue. EPA argues that its view of whether it was "impracticable" to object during the notice and comment period is subject to arbitrary and capricious review. *See* EPA Opp. 5. For their part, Environmental Petitioners argue that "[l]imited deference on these notice questions makes sense" because "EPA has no greater expertise than this [c]ourt in determining whether a certain issue was impracticable to raise during the comment period." Environmental Petitioners' Reply 7 (internal quotation marks omitted). We need not resolve this dispute, however, because EPA's decision to stay the methane rule was arbitrary and capricious—that is, unlawful even under the more deferential standard.

We begin—and ultimately end—with impracticability. Environmental Petitioners and EPA agree that this issue turns on whether industry groups had an opportunity to raise their objections during the comment period, which in turn depends on whether the NPRM provided adequate notice of the final methane rule. This case hinges, then, on whether the final rule was a logical outgrowth of the NPRM. A final rule is the "logical outgrowth" of a proposed rule if "interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *CSX Transportation, Inc. v. Surface Transportation Board*, 584 F.3d 1076, 1080 (D.C. Cir. 2009) (citation and internal quotation marks omitted). A final rule "fails the logical outgrowth test" if "interested parties would have had to divine the agency's unspoken thoughts, because the final rule was surprisingly distant from the proposed rule." *Id.* (citations and alterations omitted).

EPA granted reconsideration and stayed the emissions standards on four grounds: (1) industry groups had no opportunity to object to provisions concerning "low production well sites," (2) the final rule included a process for demonstrating "alternative means" of compliance that was not in the NPRM, (3) without adequate notice or consideration of costs, the final rule required "certification by a professional engineer" that regulated entities had a proper closed vent system, and (4) without adequate notice, the final rule predicated an exemption from regulation for "well site pneumatic pumps" on a professional engineer's certification that "it is technically infeasible to route the pneumatic pump to a control device or a process." 82 Fed. Reg. at 25,731–32. An examination of the record demonstrates that each of these statements is inaccurate and thus unreasonable.

### Low-Production Wells

The final rule subjects low-production wells to fugitive emissions requirements. 81 Fed. Reg. at 35,856. After EPA promulgated the rule, industry groups petitioned for reconsideration, arguing that the agency should have exempted such wells from regulation. *See, e.g.*, API Reconsideration Request, at 12. One group, IPAA, also argued that the low-production well provision conflicted with EPA's definition of when an existing well site has been "modifi[ed]." IPAA, Request for Administrative Reconsideration, at 6 (Aug. 2, 2016) ("IPAA Reconsideration Request").

When EPA granted reconsideration and imposed the stay, however, it invoked a wholly different rationale: acting pursuant to CAA section 307(d)(7)(B), EPA concluded that

"the final rule differs significantly from what was proposed in that it requires these well sites to comply with the fugitive emissions requirements based on information and [a] rationale not presented for public comment during the proposal stage." 82 Fed. Reg. 25,731. EPA, in other words, justified the stay on the ground that the final rule failed the logical outgrowth test.

Although it is true that the NPRM for the final methane rule proposed to *exclude* low-production well sites, EPA and Industry Intervenors ignore the fact that the notice went on to solicit comment on whether such an exclusion would be warranted. The NPRM states: "To more fully evaluate the exclusion, we solicit comment on the air emissions associated with low production wells . . . . [W]e solicit comment on the relationship between production and fugitive emissions over time." 80 Fed. Reg. 56,639 (Sept. 18, 2015). The NPRM also states that EPA "solicit[s] comment on whether [it] should include low production well sites for fugitive emissions and *if these types of well sites are not excluded*, should they have a less frequent monitoring requirement." *Id.* (emphasis added).

Many regulated entities responded with comments, including the industry groups that later sought reconsideration. *See, e.g.*, API, Comments on EPA's NSPS for the Oil and Natural Gas Sector, at 103 (Dec. 4, 2015) ("API Comments"). API, for instance, submitted extensive comments on low-production wells, noting its support for an exemption and clarifying that "fugitive emissions [from such wells] do not correlate to production." *Id.*

Responding to these comments in the final rule, EPA explained that it had decided not to exempt low-production

wells because, among other reasons, "[i]n discussions with us, stakeholders indicated that well site fugitive emissions are not correlated with levels of production, but rather based on the number of pieces of equipment and components." 81 Fed. Reg. at 35,856. The final rule thus responded directly to comments and information EPA now claims it was impracticable for industry groups to have presented.

Perhaps sensing the flimsiness of its claim that regulated entities had no opportunity to comment on low-production wells, EPA argues that the stay was also warranted because the low-production well provision is inconsistent with the rule's definition of well "modification." EPA Opp. 17–18. As noted above, this was one of IPAA's arguments for reconsideration. *See supra* 15. It was not, however, the rationale on which EPA relied when it granted reconsideration and stayed the rule. EPA cannot now justify its action on a rationale it failed to invoke when it imposed the stay. *See Chenery*, 332 U.S. at 196.

## Alternative Means of Compliance

The final rule permits regulated entities to demonstrate that they comply with emissions regulations by alternative means, and thus, ought not be subject to the rule. Specifically, the rule provides that regulated entities may "submit an application requesting that the EPA approve certain state requirement [*sic*] as 'alternative means of emission limitations' under the NSPS . . . ." 81 Fed. Reg. at 35,871. The rule then lays out the process for filing such applications. *Id.*; *see also* 40 C.F.R. § 60.5398a.

After the rule was promulgated, TXOGA requested reconsideration of the process "for determining State Equivalency," *i.e.*, the alternative-means process. Administrative Petition for Reconsideration by the Texas Oil and Gas Association, No. EPA-HQ-OAR-2010-0505, at 2–3 (Aug. 2, 2016). EPA granted this request and stayed the rule on the ground that the alternative-means "process and criteria were included in the [final] 2016 Rule without having been proposed for notice and comment." 82 Fed. Reg. at 25,731.

In the NPRM, however, EPA expressly solicited "comments on criteria we can use to determine whether and under what conditions all new or modified well sites operating under corporate fugitive monitoring programs can be deemed to be meeting the equivalent of the NSPS standards . . . ." 80 Fed. Reg. at 56,638. The NPRM continued: "We also solicit comment on how to address *enforceability* of such alternative approaches . . . ." *Id.* (emphasis added). In response, industry groups commented on the issue, and API specifically requested a "streamlined approval process" for deeming regulated entities compliant by alternative means. API Comments at 138. The final rule adopted just such a process.

Here, too, the final rule was a logical outgrowth of the NPRM. No regulated entity had to "divine the agency's unspoken thoughts," *CSX Transportation*, 584 F.3d at 1080 (alteration omitted), in order to comment on the "alternative means" approval process. To the contrary, we know that affected parties anticipated the final rule because they expressly requested a streamlined approval process and commented on its contours.

## Vent System Certification

The final rule requires regulated entities to obtain "certification by a qualified professional engineer [PE] that the closed vent system is properly designed . . . ." 81 Fed. Reg. at 35,871. API sought reconsideration on the grounds that "[t]he provisions [for] PE certification were not included in the proposed rule" and API was therefore unable "to raise an objection during the public comment period." API Reconsideration Request, at 1. Agreeing with API, EPA granted reconsideration because the agency "had not analyzed the costs associated with the PE certification requirement" before promulgating the rule, making it "impracticable for petitioners to provide meaningful comments during the comment period on whether the improved environmental performance this requirement may achieve justifies the associated costs and other compliance burden[s]." 82 Fed. Reg. at 25,732.

Yet again, even a brief scan of the record demonstrates the inaccuracy of EPA's statements. The NPRM "request[s] comment as to whether [EPA] should specify criteria by which the PE verifies that the closed vent system is designed to accommodate all streams routed to the facility's control system . . . ." 80 Fed. Reg. at 56,649. In the very next line, the NPRM "request[s] comment as to what types of cost-effective pressure monitoring systems can be utilized to ensure" proper design of closed vent systems. *Id.* The NPRM also includes a lengthy discussion of the "costs and benefits" of the rule. *Id.* at 56,596–97.

In response, industry groups submitted many comments on the PE certification requirement. API itself commented that requiring a PE to review vent system design was "unnecessary" because "[o]il and natural gas company engineering staff . . . are able to design systems effectively." API Comments at 48–49. API also expressed concern about the burden the PE requirement would impose on regulated parties, *id.* at 49, and argued that the certification requirement was an effort to shift the cost of enforcement from EPA to the industry, *id.* at 48. Separately, IPAA commented that the entire rule's "increased record-keeping and reporting requirements" imposed unreasonable costs on regulated parties. IPAA & American Exploration & Production Council, Comments for Three Regulatory Proposals, at 28 (Dec. 4, 2015).

These comments demonstrate that industry groups had an opportunity to express their views on PE certification of vent systems, including the rule's costs. As noted above, the NPRM not only sought comment on types of "cost-effective" measures for vent system design, 80 Fed. Reg. at 56,649, but it also included an analysis of the entire rule's costs and benefits, *id.* at 56,596–97. Had commenters been concerned about the cost of PE certification of vent systems, they could have argued that the cost-benefit analysis failed to address that specific provision of the regulation. It was thus entirely practicable for industry groups to lodge their objections to the PE certification requirement during the comment period.

### Pneumatic Pumps

Finally, the 2016 rule exempts well-site pneumatic pumps from the final rule so long as a professional engineer has

certified that it is "technically infeasible to capture and route pneumatic pump emissions to a control device or process . . . ." 81 Fed. Reg. at 35,850. The rule explained that this exemption would not apply to "entirely new" facilities because "circumstances that could otherwise make control of a pneumatic pump technically infeasible at an existing location can be addressed in the site's design and construction." *Id.*

In its petition for reconsideration, IPAA objected to the idea that a professional engineer must certify "technical infeasibility," arguing that the final rule "added a variety of requirements associated with 'technical infeasibility' that were not purposed [*sic*] or even mentioned in the proposed rule." IPAA Reconsideration Request at 7. API mounted a similar objection to the pneumatic pump exemption, arguing that it had "no opportunity to comment" on the distinction between new construction sites (known as "greenfield" sites) and older emissions sites ("brownfield" sites). *See* API Reconsideration Request at 2.

Embracing these arguments, EPA granted reconsideration on the ground that it had never "propose[d] or otherwise suggest[ed] exempting well site pneumatic pumps from emission control based on such [PE] certification." 82 Fed. Reg. at 25,732. EPA added that the specific details of the exemption, including the distinction between old and new sites, "were included . . . without having been proposed for notice and comment." *Id.*

After proposing that a professional engineer certify regulated entities' closed vent systems, the NPRM states that operators of oil and natural gas facilities must also "connect the

pneumatic pump affected facility through a closed vent system . . . ." 80 Fed. Reg. at 56,649, 56,666. In response, API submitted extensive comments on the challenges of connecting pneumatic pumps to "an existing control device." API Comments at 78. API explained that given the design of many *existing* sites, the pneumatic pump requirement was "not technically feasible." *Id.* Accordingly, API expressly requested that EPA "provide [an] exclusion in the rule such that routing a pneumatic pump affected source to an existing control device or closed vent system is not required *if it is not technically feasible* . . . ." *Id.* (emphasis added). The comment continued: "If needed, EPA could provide provisions in the rule for an operator to make *an engineering determination* that an existing control device cannot technically handle the additional gas from a pneumatic pump affected source exhaust, document this determination, and make such a determination available for inspection by EPA or other competent authority." *Id*. (emphasis added). API, in other words, proposed precisely the technical infeasibility language EPA adopted in the final rule, suggested that an engineer certify technical infeasibility, and justified its proposed exemption based on a lengthy description of why existing sites were not designed to "handle" EPA's proposal. *Id.*

Given this, it was perfectly logical for EPA to adopt an exception to its proposed rule that requires a professional engineer's certification of infeasibility, and to limit that exception to sites that had already been designed in a way that made compliance infeasible. The record thus belies EPA's claim that no industry group had an opportunity to comment on the "scope and parameters" of the pneumatic pump exemption. EPA Opp. 22.

## IV.

The administrative record thus makes clear that industry groups had ample opportunity to comment on all four issues on which EPA granted reconsideration, and indeed, that in several instances the agency incorporated those comments directly into the final rule. Because it was thus not "impracticable" for industry groups to have raised such objections during the notice and comment period, CAA section 307(d)(7)(B) did not require reconsideration and did not authorize the stay. EPA's decision to impose a stay, in other words, was "arbitrary, capricious, [and] . . . in excess of [its] . . . statutory . . . authority." 42 U.S.C. § 7607(d)(9)(A), (C). We shall therefore grant Environmental Petitioners' motion to vacate the stay.

We emphasize, however, that nothing in this opinion in any way limits EPA's authority to reconsider the final rule and to proceed with its June 16 NPRM. Although EPA had no section 307(d)(7)(B) *obligation* to reconsider the methane rule, it is free to do so as long as "the new policy is permissible under the statute . . , there are good reasons for it, and . . . the agency *believes* it to be better." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

*So Ordered.*

BROWN, *Circuit Judge*, dissenting: My colleagues are quick to claim we have jurisdiction to hear this motion, but I disagree. While we presumptively possess jurisdiction over "final agency action," the Administrative Procedure Act deprives us of jurisdiction when, *inter alia*, "agency action is committed to agency discretion by law." *See* 5 U.S.C. § 701(a)(2). The Court acknowledges EPA's decision to grant reconsideration "is not reviewable final agency action" as it "merely begins a process that could culminate in no change to the rule." Op. 6. The Court further claims the Clean Air Act provision at issue here "expressly links EPA's power to stay a final rule to the two requirements for mandatory reconsideration . . . ." *Id.* at 10. Indeed it does. *See* 42 U.S.C. § 7607(d)(7)(B) ("Such reconsideration shall not postpone the effectiveness of the rule. The effectiveness of the rule may be stayed during such reconsideration, however, by the Administrator or the court for a period not to exceed three months.").[1] Nevertheless, the Court concludes EPA's

---

[1] It is far from clear that designating the judiciary as an alternative forum to seek a stay, as the statute does, makes EPA action on stays subject to judicial review. *But see* Op. 9. The text's obvious reading is to give private parties power to seek a stay without having to ask the agency. Given the statutory context, this makes sense; an agency may not want to reconsider its rule, let alone stay its implementation to facilitate an undesired reconsideration. By establishing the judiciary as an alternative, the statute ensures stays result from factual warrant and not simply because the agency wills one. Even if the statute could be read to authorize judicial review of agency action on stays, there is no basis to conclude review extends beyond *denied* stays. A denied stay in this statutory context—reconsideration based on new grounds or grounds "impracticable" to raise during rulemaking—might be judicially reviewable for the same reason the denial of such reconsideration petitions are reviewable. *Cf. Sendra Corp. v. Magaw*, 111 F.3d 162, 166 (D.C. Cir. 1997) ("An agency's denial of a petition . . . for reconsideration is not itself subject to judicial review if the petition alleges only 'material error' in the agency's original decision. . . . On

decision to stay the rule pending reconsideration is subject to judicial review, claiming the stay is "final agency action" "with respect to" complying with the rule. *See* Op. 7. It also characterizes the stay as "essentially an order delaying the rule's effective date." *Id.* at 6. But hitting the pause button is the antithesis of ending the matter. The Court presumes a certain outcome from EPA's reconsideration, one that a stay alone gives us no basis to presume. A stay is, of course, "final" as to whether one must comply with the rule during reconsideration—just as a trial court's evidentiary determination is "final" until the time for appeal ripens. That some agency action resolves itself does not render it "final." If it did, every interlocutory action that leaves compliance to the discretion of the regulated party would justify judicial review. The stay is "essentially" nothing but a stay, and it does not qualify as "final agency action" under the two-part inquiry set forth by the Supreme Court.

As EPA's stay here is "of a[n] . . . interlocutory nature," it cannot satisfy the first element of "final agency action:" consummation of the agency's decision-making process. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997); *see also Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003) ("Agency action is considered final to the extent it imposes an obligation, denies a right, or fixes some legal relationship."). Here, EPA's ninety-day stay is limited to specific requirements within the rule that are among the subjects of reconsideration—

---

the other hand, if an agency denies a petition for reconsideration alleging 'new evidence' or 'changed circumstances,' the agency's denial is reviewable as a final agency action . . . ."). But, EPA *granting* a stay does not present the same risk of agency short shrift toward reconsideration. Nothing about the text or its context justifies importing a new purpose into the statute to authorize judicial review of granted stays.

requirements for fugitive emissions, pneumatic pump standards, and certification requirements for professional engineers. *See* Pet'r Attach. 4–5. A temporary stay facilitates reconsidering these discrete issues; it does not resolve them. This is not the kind of agency action considered "final." *Cf. Reliable*, 324 F.3d at 731 ("The agency's conduct thus far amounts to . . . a statement of the agency's intention to make a preliminary determination . . . and a request for voluntary corrective action."). The Environmental Petitioners will be able to raise their arguments regarding the alleged harms of revisiting EPA's rule during the reconsideration process, and once again during the litigation that will surely follow EPA's reconsideration. With these available avenues, it belies the virtue of "final agency action" to include an agency's intermediate stay within the standard's ambit. *See id.* at 733 ("So long as Reliable retains the opportunity to convince the agency that it lacks jurisdiction over Reliable's sprinkler heads, it makes no sense for a court to intervene. It conserves both judicial and administrative resources to allow the required agency deliberative process to take place before judicial review is undertaken."); *Ciba-Geigy Corp. v. U.S. EPA*, 801 F.2d 430, 436 (D.C. Cir. 1986) ("Judicial review at [this] stage improperly intrudes into the agency's decisionmaking process. It also squanders judicial resources since the challenging party still enjoys an opportunity to convince the agency to change its mind.").

The Court relies on a series of pre-*Bennett* cases to equate EPA's stay with instances where this court has reviewed an agency amending or revoking a rule. *See* Op. 7. None of these cases are apposite.[2] And while *Int'l Union, United Mine*

---

[2] *Environmental Defense Fund, Inc. v. Gorsuch*, 713 F.2d 802 (D.C. Cir. 1983) holds "an agency decision which effectively suspends the implementation of important and duly promulgated standards . . .

4

*Workers of Am. v. Mine Safety & Health Admin.*, 823 F.2d 608 (D.C. Cir. 1987) may seem analogous, it does not involve the sort of neutral, time-limited stay involved here.[3]

---

constitutes rulemaking subject to notice and comment . . . ." *Id.* at 816 (citing *Council of the Southern Mountains, Inc. v. Donovan*, 653 F.3d 573 (D.C. Cir. 1981) and *Nat. Res. Def. Council, Inc. v. EPA*, 683 F.2d 752 (3d Cir. 1982) as "stand[ing] for the [same] proposition"). It is not credible to suggest that, absent submitting its stay pending reconsideration through notice and comment rulemaking, EPA's action is *ultra vires* and thereby subject to judicial review.

[3] The question in *Int'l Union* was the following: Whether an administrative law judge could order the Mine Safety & Health Administration to grant a party "interim relief" from a mine-safety standard while that party awaited a decision on whether it could receive a "mine-specific exemption from [the] mandatory standard." *See* 823 F.3d at 610–12. Exemptions were only granted when the agency determined "an alternative method" to the mandatory standard could "guarantee no less than the same measure of protection" afforded by the standard "at all times." *See id.* at 611. But subjecting a particular regulated entity to a different compliance standard via an exemption is not the same as staying a rule pending its reconsideration—that exemption *alters* the *status quo* (the mandatory rule) as to one party, while here, staying the rule *preserves* the *status quo* (no rule in effect) as to everyone. Further, in the exemption context, the "interim relief" is akin to an injunction; an ALJ is ordering the agency not to enforce the existing standard as to the exemption-petitioning party, *and ordering the petitioning party* to comply with an interim standard. *See id.* at 612–13. In the context of this stay, however, EPA is not ordering anyone to do anything. The agency is merely announcing that it has decided to allocate its resources towards reconsideration rather than enforcing the rule. Despite the Court's contrary intimations, enjoining conduct is not the same action as issuing a stay. *Cf. Nken v. Holder*, 556 U.S. 418, 428–29 (2009) ("A stay pending appeal certainly has some functional overlap with an injunction . . . . Both can have the practical effect of preventing some action before the legality of that

In contrast to our precedent, the Court's opinion concludes a particular administrative proceeding has innumerable final agency actions, including intermediate decisions. No authority supports this proposition. The majority contends *Friedman v. FAA*, 841 F.3d 537 (D.C. Cir. 2016) does, Op. 8–9, but *Friedman* was *sui generis*; it spoke only to the "specific facts presented," a "constructive denial of Friedman's application for a first class [medical] certificate." 841 F.3d at 541. Here, unlike in *Friedman*, the agency has not placed Environmental Petitioners in an indefinite "holding pattern" preventing "any explicitly final determination." *Cf. id.* at 542. Rather, EPA has authorized a time-limited stay during which it will proceed through the rule reconsideration process—a process where, as mentioned above, the Environmental Petitioners are free to voice their objections and then sue the agency if they disagree with the agency's actions. *Cf. Ciba-Geigy*, 801 F.2d at 437 (finding "final agency action" when EPA's action, unlike the stay here, "gave no indication that [its position was] subject to further agency consideration or possible modification"). This is a far cry from an agency "clearly communicat[ing] it will not reach a determination on a petitioner's submission . . . [while] simultaneously refus[ing] to deny the petitioner's submission." *Friedman*, 841 F.3d at 542.

As a rule of decision, the Court's unbounded reading of *Friedman* creates a peculiar backdoor: The Court insists, correctly, EPA's decision to reconsider the rule is within the agency's discretion. But if the stay is not, and the stay is tied

---

action has been conclusively determined. But a stay achieves this result by temporarily suspending the source of authority to act—the order or judgment in question—not by directing an actor's conduct.").

up with the reconsideration authority, deeming the stay "final agency action" allows the Court to review the basis for reconsideration itself. *See* Op. 10. Certainly, the rule of law would benefit from the judiciary shedding its unfortunate sheepishness towards reviewing agency action. But that noble goal does not absolve us from "carefully consider[ing] why and when we are meant to" review agency action. *See AKM LLC v. Sec'y of Labor*, 675 F.3d 752, 769 (D.C. Cir. 2012) (Brown, J., concurring). Yes, the "reflex of deference" can be dangerous. *Id.* But so is an aneurysm of activism that enlarges a doctrine by engorging judicial prerogatives to the point of rupturing the separation of powers. *See Santa Monica Beach, LTD. v. Superior Court*, 968 P.2d 993, 1040 (Cal. 1999) (Brown, J., dissenting) ("Judicial review is properly conceived in narrow terms. It is not a license to supersede the exercise of power by a coordinate branch which acts well within constitutional boundaries."). If an intermediate stay is the *consummation* of an agency's decision-making, we have conflated the agency *preserving the status quo*, *i.e.*, forestalling the rule's requirements in order to reconsider them, with the agency *completing* a course of action, *i.e.*, ordering compliance. In my view, this is erroneous.

Turning to the second element of "final agency action," the Court establishes nothing by asserting the stay creates obvious consequences for the regulated parties. *See, e.g.*, Op. 8. Agency actions of various kinds, "final" or not, come with consequences. The relevant question is whether the consequences have a "legal force or practical effect" *beyond* "the disruptions that accompany" the agency making a decision to "initiate proceedings." *See Fed. Trade Comm'n v. Standard Oil Co. of Cal.*, 449 U.S. 232, 241, 243 (1980).

Here, EPA's unreviewable decision to reconsider its rule is akin to an agency making "a precatory finding of [a] 'reason

to believe'" legal action is warranted. *Cf. Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 173 F. Supp.2d 41, 44 (D.D.C. 2001) (quoting *Standard Oil Co.*, 449 U.S. at 234). The stay—designed so EPA can devote resources to reconsidering the rule rather than enforcing it, and so industry can avoid implementing changes that reconsideration may later obviate—is subsidiary to the reconsideration itself. If "final agency action" cannot encompass the decision to reconsider the rule, "it cannot possibly encompass the . . . steps that the [agency] has taken to date" to facilitate reconsideration. *See id.* at 44. EPA is not compelling compliance here. If a regulated entity wants to comport its conduct to the requirements of the stayed rule, it is free to do so. By issuing the stay, all the EPA has indicated it that it will not, legally or practically, enforce the rule under reconsideration. The stay's consequences therefore do not impose legal or practical requirements on anyone—separating them from the kind of consequences encompassed by "final agency action." *Cf. Reliable*, 324 F.3d at 735 ("The discovery orders in *ARCO* were legally binding orders, whereas here, there is no order, only the possibility of Reliable having to defend itself at an enforcement hearing if Reliable does not undertake certain voluntary action, and if the agency decides to proceed against it.").

The Court is thus in error to claim *Ciba-Geigy*. *See* Op. 9. *Ciba-Geigy* was a "comply-or-else" case; "the next step was not further adjudication, but an enforcement action in federal court." *CSX Transp., Inc. v. Surface Transp. Bd.*, 774 F.3d 25, 32 (D.C. Cir. 2014) (explaining *Ciba-Geigy*). Here, Environmental Petitioners are not presented with agency conduct demonstrating EPA will take no additional action. EPA's stay does not ask anyone to alter their conduct, so "judicial review must wait." *See id.* That Petitioners are anxious to see their victory implemented and impatient with

delay does not make EPA's action final. It may be annoying, disappointing, ill-advised, even unlawful, but that does not transform a stay to facilitate reconsideration into "final agency action."

Without either element of the "final agency action" inquiry satisfied, I cannot conclude EPA's stay falls within our jurisdictional reach. Section 7607(d)(7)(B) renders a stay a mere means to facilitate a decision we lack the authority to review. Accordingly, I would dismiss the Environmental Petitioners' motion on the grounds that we lack jurisdiction to review EPA's stay, and not reach the remaining issues. As the Court does otherwise, I respectfully dissent from the Court's decision to grant the motion and vacate EPA's stay.