Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 23, 2004      Decided April 16, 2004

No. 03-1017

AT&T CORPORATION,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

WORLDCOM INC., ET AL.,
INTERVENORS

———

On Petition for Review of an Order of the
Federal Communications Commission

———

*Paul J. Zidlicky* argued the cause for petitioner. With him on the briefs were *David L. Lawson*, *Jonathan F. Cohn*, *David W. Carpenter*, *John E. Benedict*, *H. Richard Juhnke*,

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*William Single IV, Jeffrey A. Rackow, Donald B. Verilli, Jr., Mark D. Schneider* and *Michael DeSanctis*. *Mark C. Rosenblum* and *Jodie L. Kelley* entered appearances.

*Joel Marcus*, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *Robert H. Pate, III*, Assistant Attorney General, U.S. Department of Justice, *Robert B. Nicholson* and *Robert J. Wiggers*, Attorneys, *John A. Rogovin*, General Counsel, Federal Communications Commission, and *Daniel M. Armstrong*, Associate General Counsel. *John E. Ingle*, Deputy Associate General Counsel, entered an appearance.

*Robert F. Aldrich* argued the cause for intervenors American Public Communications Council, Inc., et al. With him on the brief were *Albert H. Kramer, Michael K. Kellogg, Aaron M. Panner, James G. Harralson, Michael E. Glover, Edward Shakin, Gary L. Phillips* and *James D. Ellis*. *John M. Goodman* entered an appearance.

Before: RANDOLPH, ROGERS, and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

RANDOLPH, *Circuit Judge*: For nearly a decade the Federal Communications Commission has attempted to restructure payphone compensation in compliance with the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56. The 1996 Act required the Commission to "establish a per call compensation plan to ensure that all payphone service providers are fairly compensated for each and every completed intrastate and interstate call using their payphone[.]" 47 U.S.C. § 276(b)(1)(A). On three prior occasions we have ruled on various aspects of the Commission's payphone compensation plan. *Illinois Pub. Telecommunications Ass'n v. FCC*, 117 F.3d 555 (D.C. Cir. 1997), *supplemented at* 123 F.3d 693 (D.C. Cir. 1997); *MCI Telecommunications Corp. v. FCC*, 143 F.3d 606 (D.C. Cir. 1998); *Am. Pub. Communications Council v. FCC*, 215 F.3d 51 (D.C. Cir. 2000) ("*APCC*"). Petitioner AT&T and intervenors MCI and Sprint ("AT&T"), all long-distance carriers, now challenge the Commission's latest revision of the compensation amount.

At the heart of these proceedings is the compensation of coinless calls – those calls in which the caller, instead of depositing money in the payphone, dials an access number or a toll free number. In 1996 the Commission designed a system in which the long-distance carrier handling the coinless call reimburses the payphone service provider on a flat-rate, per phone basis.[1] *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, *Report and Order*, 11 F.C.C.R. 20,541 (Sept. 20, 1996) ("First Order"). Calculating a per phone compensation figure requires multiplying two numbers: a set price per call and an average volume of calls per phone. *Id.* ¶¶ 119-25. The Commission expected that reimbursement would switch to a per call basis once tracking technology was in place. *Id.* ¶ 99. Call tracking would eliminate the need for an average call volume estimate. The First Order determined the price of a call to be 35 cents and the average number of calls from a payphone to be 131 per month, equaling $45.85 per phone. *Id.* ¶¶ 119-25. The Commission intended this rate to apply from November 7, 1996, to October 6, 1997, when it expected the tracking technology to have been fully implemented. *Id.* ¶ 126. This interval has become known as the Interim Period. The Commission also set the 35 cent per call rate as the default rate for the first year of per-call compensation after October 6, 1997. *Id.* ¶ 72.

In response to the petitions of various parties challenging the First Order, we vacated and remanded the 35 cent per call compensation rate for coinless calls. *Illinois*, 117 F.3d at 564-65, *clarified at* 123 F.3d at 694. No party challenged the 131 call volume estimate. On remand, the Commission, using a different methodology, adjusted the per call compensation rate to 28.4 cents per call. *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996, Second Report and Order*, 13 F.C.C.R. 1778 ¶ 1 (Oct. 9, 1997) ("Second Order"). The Commission established this rate for two years beyond

---

[1] Much of the background on the Commission's efforts at payphone compensation is set forth in *APCC*, 215 F.3d at 52-55.

October 7, 1997. Because call tracking had not yet been fully implemented, the new rate served both as a default rate for tracked calls and as a basis for per-phone compensation. The Commission also tentatively applied this rate to the Interim Period, although it deferred full reconsideration of the Interim Period rate as ordered in *Illinois* until a later time. *Id.* ¶ 4. Finding this rate deficient as well, we remanded but did not vacate the 28.4 cent rate, giving the Commission six months to adopt a different figure. *MCI*, 143 F.3d at 609. On remand the Commission again established a new rate, this time 24 cents per call, which it applied retroactively to both the Interim Period and the interval between October 7, 1997, and April 20, 1999, the effective date of the newly-issued rate. *In re Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, *Third Report and Order, and Order on Reconsideration of the Second Report and Order*, 14 F.C.C.R. 2545 (Feb. 4, 1999) ("Third Order"). This latter interval is considered the Intermediate Period. The Commission also stated that the 24 cent price would serve as the default rate for coinless calls through January 31, 2002.[2] *Id.* ¶ 18. We affirmed the Commission's per call compensation rate. *APCC*, 215 F.3d 51.

In 2002 the Commission, still addressing the *Illinois* remand, further revised the per call estimate to 22.9 cents per call for the Interim and Intermediate Periods. *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996, Fourth Order on Reconsideration and Order on Remand*, 17 F.C.C.R. 2020 ¶ 7 (Jan. 31, 2002) ("Fourth Order"). Due to the availability of new call volume data, the Commission, *inter alia*, adjusted the average call volume figure from 131 to 148 for both periods. *Id.* ¶¶ 11, 36. As it did in the previous orders, the Commission also applied the revised figures prospectively – this time from April 21, 1999 forward, an interval

---

[2] The original text incorrectly stated "January 31, 2001" instead of "January 31, 2002." *See Erratum*, 14 F.C.C.R. 2545 (Mar. 12, 1999).

the parties call the Post-Intermediate Period. *Id.* App. A. No party asked the Commission to reconsider the 22.9 cents per call figure. MCI petitioned for reconsideration on the ground that the data and methodology the Commission used to reach the 148 call estimate were faulty and that the Commission should have applied a decline factor for 1998 and beyond to take into account decreasing payphone call volume. AT&T filed comments on MCI's petition. The Commission, in refusing to reopen this aspect of the Fourth Order, defended the quality of the data it used to reach the 148 figure and its decision not to adopt a decline factor in light of insufficient evidence demonstrating a decrease in per payphone call volume. *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996, Fifth Order on Reconsideration and Order on Remand*, 17 F.C.C.R. 21,274 ¶ ¶ 16-22 (Oct. 23, 2002) ("Fifth Order").

AT&T then filed this action seeking judicial review of the Fifth Order in which the Commission denied MCI's petition for reconsideration.

The general rule is that an agency's denial of a petition for reconsideration is not subject to judicial review. *ICC v. Bhd. of Locomotive Engineers*, 482 U.S. 270, 278-79 (1987); *Southwestern Bell Tel. Co. v. FCC*, 180 F.3d 307, 310 (D.C. Cir. 1999); *Beehive Tel. Co. v. FCC*, 180 F.3d 314, 317-18 (D.C. Cir. 1999); *Microwave Communications, Inc. v. FCC*, 515 F.2d 385, 387 n.7 (D.C. Cir. 1974). AT&T admits that it sought review only of the Commission's Fifth Order denying reconsideration. But the general rule does not apply here, so AT&T argues, because the Commission had no discretion to deny reconsideration – reconsideration was mandatory under § 276(b)(1) of the 1996 Act. This section states that the Commission, "within 9 months after February 8, 1996, . . . shall take all actions necessary (including any reconsideration) to prescribe regulations . . . to ensure that all payphone service providers are fairly compensated. . . ." 47 U.S.C. § 276(b)(1). The use of the word "shall," according to AT&T, removes the Commission's discretion to deny a reconsideration petition, at least when the Commission believes granting

the petition is "necessary" to ensure fair payphone compensation.

AT&T's interpretation of § 276(b)(1) is impossible. On the face of it, the provision simply established a temporal mandate – 9 months. Section 276(b)(1) says nothing about the decision whether to grant a petition for reconsideration. It speaks only to how long the Commission may take for its initial actions and for proceedings, if any, after it has granted a petition for reconsideration. The evident purpose of Congress was to speed things up. Yet AT&T's version of § 276(b)(1) would only slow things down. We therefore cannot read § 276(b)(1) as departing – solely for the purpose of restructuring the payphone market – from the longstanding rule that the Commission may in its discretion deny a petition for reconsideration.

The Fifth Order, as a denial of reconsideration, is thus not subject to judicial review unless it falls within some exception to the general rule. The Supreme Court described such an exception in *Locomotive Engineers*: when the request for agency reconsideration rested on "new evidence or changed circumstances that rendered the agency's original order inappropriate." 482 U.S. at 278 (internal quotations omitted). The Court was there interpreting the Interstate Commerce Act, which contained three grounds for rehearing: "material error, new evidence, or substantially changed circumstances." 482 U.S. at 277 (citing 49 U.S.C. § 10327(g) (current version at 49 U.S.C. § 722(c))). Here, the rehearing statute – 47 U.S.C. § 405(a) – does not use those words. It specifies no grounds for rehearing, leaving the matter to "such general rules as the Commission may establish."[3] The Commission's rules provide that a petition for rehearing relying on facts not presented in the original proceeding "may" be granted if the facts "relate to events" occurring after "the last opportunity

---

[3]   Section 405(a) provides that if the Commission grants reconsideration, it is limited to taking "newly discovered evidence, evidence which has become available only since the original taking of evidence, or evidence which the Commission . . . believes should have been taken in the original proceeding."

to present such matters," or if the petition "relies on facts unknown to petitioner . . . which could not, through the exercise of ordinary diligence, have been learned prior to such opportunity." 47 C.F.R. § 1.106(c) & (b)(2). In *Southwestern Bell*, 180 F.3d at 311, and *Beehive*, 180 F.3d at 318, we assumed that the Commission's rehearing rules were comparable to those recited in the Court's *Locomotive Engineers* opinion. *See also Transportation Intelligence, Inc. v. FCC*, 336 F.3d 1058, 1062 (D.C. Cir. 2003); *Schoenbohm v. FCC*, 204 F.3d 243, 245 (D.C. Cir. 2000). We will do the same in considering AT&T's argument that the Commission should have reconsidered its Fourth Order in light of new evidence showing a decline in call volume in the Post-Intermediate Period. (AT&T concedes that its claims pertaining to the Interim and Intermediate Periods, and its other claims applicable to the Post-Intermediate Period, were not based on new evidence.)

The supposed new evidence consisted of the following. In May 2002, after the Fourth Order issued, MCI filed a reply to comments on its petition for reconsideration of the Fourth Order. MCI's reply cited its internal data for completed payphone calls in the first quarters of 1998, 1999, 2000 and 2001, which it said showed that calls per payphone have been declining over time. For the same purpose, MCI also cited data from Southwestern Bell ("SBC"), a regional Bell operating company ("RBOC"), dealing with the routing of payphone calls to long-distance carriers or other carriers for the fourth quarters of 1997, 1998, 2000 and the third quarter of 2001. SBC had filed this data in March 2002 in compliance with the Commission's request of December 20, 2001. The Commission sought the information from SBC and other RBOCs so that it could, as it did in the Fifth Order, determine the allocation of per-payphone payments among long-distance carriers. *See* Fifth Order, 17 F.C.C.R. 21,274 ¶ 49.

According to AT&T, not only the SBC data MCI cited in its reconsideration reply but also all the data submitted by the other RBOCs in March 2002 constitute new evidence warranting an exception to the rule that reconsideration denials are

not reviewable.[4] This misapprehends the law. The petition for reconsideration must present the allegedly new evidence to the agency; even if the party does so and even if the evidence is in fact newly discovered, a court will reverse an agency's denial of reconsideration only "in the most extraordinary circumstances," *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 296 (1974), and only if the agency has engaged in the "clearest abuse of discretion." *Locomotive Engineers*, 482 U.S. at 278, quoting *United States v. Pierce Auto Freight Lines, Inc.*, 327 U.S. 515, 534-35 (1946); *but cf. Jost v. Surface Transp. Bd.*, 194 F. 3d 79, 85 (D.C. Cir. 1999). When a party has not presented the evidence to the agency in its reconsideration petition, the evidence is not "new": if "no new data ... has been put forward as the basis for reopening," the agency's denial of rehearing is not reviewable. *Locomotive Engineers*, 482 U.S. at 279. The Commission's rules make this plain. The only new facts that can serve as a basis for granting reconsideration are those the "petition relies on." 47 C.F.R. § 1.106(b)(2)(i) & (ii).

Here neither MCI's petition for reconsideration, nor anyone else's, relied on March 2002 data supplied by any of the RBOCs other than SBC. It follows that the only question is whether the SBC data constituted new evidence, that is, facts relating to events occurring after the Fourth Order or facts unknown to AT&T which could not have been known by the exercise of ordinary diligence. *Id.*; *see Southwestern Bell*, 180 F.3d at 312.

We believe the data MCI cited to the Commission falls into neither category. The SBC data covered a period dating back more than four years before the Fourth Order issued at the end of January 2002. AT&T has not shown that this data was nonexistent prior to the Fourth Order. Still less has AT&T offered any cogent reason why it, or some other party, could not have requested the Commission to seek the data from SBC, as the Commission did on its own in December

---

[4] AT&T does not claim that MCI's own data qualified as new evidence.

2001. It is not enough to point out that "March comes after January." Pet. Reply Br. at 7. In order to constitute new facts under the Commission's rules the petitioner must have exercised ordinary diligence to learn of them. So too under *Locomotive Engineers*: the failure to have the evidence placed before the agency in the original proceeding must be of "no fault" of the petitioner. 482 U.S. at 279; *compare* FED. R. CIV. P. 60(b) (motion for reconsideration allowed on ground of "newly discovered evidence which by due diligence could not have been discovered . . .").

The alleged decline in call volume was not news. AT&T claims the decline began in 1998, years before the Fourth Order. In its petition for reconsideration, MCI relied on figures published in a newspaper article in November 2001. MCI attached other newspaper articles from February 2001 and May 2001 discussing the decline. The SBC data therefore did not relate to events occurring after the Fourth Order and it did not relate to "facts unknown to" AT&T. 47 C.F.R. § 1.106(b)(2)(i) & (ii).

AT&T rests its "newly discovered evidence" claim on the alternative ground that a "public notice seeking comments in advance of the *Fourth Order* sought information solely with respect to the Interim Period [November 7, 1996, to October 6, 1997]" rather than the Post-Intermediate Period beginning in April 1999. Pet. Reply Br. at 7. Although this sounds like an inadequate-notice-and-opportunity-to-comment claim under the Administrative Procedure Act, 5 U.S.C. § 553(b); *see Sprint Corp. v. FCC,* 315 F.3d 369 (D.C. Cir. 2003), AT&T has never explicitly made that argument despite opportunities to do so.

As to the notice itself, it dealt with the RBOCs' challenge to payphone compensation issues relating to the Interim Period. *RBOC/GTE Payphone Coalition Files Proposal for Setting Payphone Compensation for Interim Period in Pay Telephone Reclassification and Compensation Proceeding, Public Notice*, 15 F.C.C.R. 18,122 (Sept. 26, 2000). The notice did not say that the Fourth Order proceedings would be restricted to deciding only those issues. And it certainly was not.

The Fourth Order was both a reconsideration of the Third Order and a continuation of the proceedings on remand from this court. As it did in prior orders, the Commission applied the new calculations beyond the time period applicable to the remand. *See* Fourth Order, 7 F.C.C.R. 2020 ¶ 4 (describing Second and Third Orders). That the Commission in the Fourth Order adjusted the call volume *both* for the Interim Period and the period thereafter should have come as no surprise. *Compare* Third Order, 14 F.C.C.R. 2545 ¶ ¶ 230-31 (setting 24 cent rate both retroactively for Interim/Intermediate Periods and prospectively until January 31, 2002).

The parties to the proceedings leading to the Fourth Order must have realized that call volume after April 1999 would be relevant. The subject was on the table from the time of the initial Notice of Proposed Rulemaking requesting comment on payphone compensation. *Notice of Proposed Rulemaking*, 11 F.C.C.R. 6716, 61 Fed. Reg. 31,481 (June 6, 1996). Charged with establishing a system of fair compensation, 47 U.S.C. § 276(b)(1)(A), the Commission went to work devising the appropriate calculations. Specifically, the Commission sought comment "on how compensation levels should be permitted to change in the future . . . Commenters should submit a summary of any data that support their arguments." *Notice of Proposed Rulemaking*, 11 F.C.C.R. 6716 ¶ 38. In the First Order the Commission set the call volume rate at 131 calls per month. First Order, 11 F.C.C.R. 20,541 ¶ 125. From then on the parties had a duty to inform the Commission of any change in conditions they thought warranted a rate adjustment. In connection with the Third Order, the Commission solicited and used call volume data to set the per call compensation rate until January 31, 2002, well beyond the end of the Interim and Intermediate Periods. Third Order, 14 F.C.C.R. 2545 ¶ ¶ 18, 230, *Erratum*. The Commission correctly stated at oral argument that call volume and cost per call are inextricably linked. The 24 cent per call rate in the Third Order resulted from the Commission's dividing per-payphone common costs ($101.29) by the total number of calls

at a marginal payphone location (439).[5]  *Id.* ¶ 191.  The Commission thus needed call volume data to set this rate. And if, as AT&T claims, the volume began declining around 1998, AT&T had good reason to believe – had notice – that this decline in volume was relevant to the proceedings on the Fourth Order.  The price set in the Third Order would otherwise continue to apply not only to the Interim and Intermediate Periods, but also to the Post-Intermediate Period.  The Commission foresaw that market conditions might require further adjustments: *"Barring an unforeseen change in the market* or in the relevant technology, we will look with disfavor upon any petition requesting that we modify, before January 31, [2002], either the compensation amount or compensation mechanism."  *Id.* ¶ 18 (emphasis added).  Yet no party "questioned [the $0.24] determination." Fourth Order, 17 F.C.C.R. 2020 ¶ 7.

When we ask, as the Commission's rules require and as *Locomotive Engineers* instructs us to, whether AT&T could have urged the Commission to consider declining call volume before it issued the Fourth Order, the answer is yes.  The SBC data MCI brought to the Commission's attention in asking for reconsideration was therefore not new evidence within the Commission's rules or *Locomotive Engineers* and it was hardly earth-shattering in any event.  Rather than suggesting a steady decline in call volume during the Post-Intermediate Period, SBC's data showed that there were more calls per payphone in the third quarter of 2001 than in the fourth quarter of 2000.  The SBC data also was inconclusive regarding whether call volume per payphone had declined since April 1999 (the beginning of the Post-Intermediate Period).[6]

---

[5]  The RBOCs provided total call volume data and then subdivided that figure into dial-around calls (which are at issue here), local coin calls and "other" calls.  *Id.* ¶ 151.

[6]  An overall decline in call volume does not necessarily translate into a decline in call volume per payphone.  It may have been, as the RBOCs argued in opposing reconsideration, that payphone

We therefore hold that the Commission's denial of reconsideration in the Fifth Order is not reviewable. This does not leave AT&T completely without recourse. The Commission has initiated a new rulemaking proceeding on payphone compensation, at the request of the American Public Communications Council. *See Request to Update Default Compensation Rate for Dial-Around Calls from Payphones*, 18 F.C.C.R. 22,811 (Oct. 31, 2003). The new Notice of Proposed Rulemaking recognizes that "industry conditions have changed significantly" and that "[p]ayphone usage and deployment are decreasing as the use of wireless services increases." *Id.* ¶ 18.

The petition for review is denied.

---

providers removed payphones as use dropped off, leaving only payphones that were generating the highest volumes.