# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 21, 2019                Decided March 13, 2020

No. 15-1015

CHESAPEAKE CLIMATE ACTION NETWORK, ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

ALABAMA POWER COMPANY, ET AL.,
INTERVENORS

Consolidated with 16-1169, 16-1349

On Petitions for Review of Agency Action of the
United States Environmental Protection Agency

*Patton Dycus* argued the cause for petitioners.  With him on the briefs were *Neil Gormley*, *James S. Pew*, and *Eric Schaeffer*.  *Sanjay Narayan* entered an appearance.

*Meghan E. Greenfield*, Trial Attorney, U.S. Department of Justice, argued the cause for respondent.  With her on the brief were *Jeffrey Bossert Clark*, Assistant Attorney General, and *Jonathan D. Brightbill*, Principal Deputy Assistant Attorney

General. *Norman L. Rave Jr.* and *Stephanie J. Talbert*, Attorneys, entered appearances.

*Lauren E. Freeman*, *Makram B. Jaber*, *Andrew D. Knudsen*, *C. Grady Moore*, *III*, *Margaret C. Campbell*, and *Emily Gerhardt* were on the brief for industry intervenor-respondents.

Before: TATEL, PILLARD, and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: Congress charged the EPA with establishing emission regulations under the Clean Air Act. In a 2014 final rule challenged here, EPA exempted coal- and oil-burning power plant utility boilers' startup periods from numerical limits on hazardous air pollutants. Instead, EPA imposed qualitative "work practice" standards during these periods of time. This consolidated action challenges that final rule on two fronts. First, Petitioners challenge EPA's denial of their petition for reconsideration of the final rule as procedurally improper. Second, Petitioners challenge the final rule itself as arbitrary and capricious.

For the reasons that follow, we conclude that EPA erred in denying Petitioners' petition for reconsideration. We grant the petition in No. 16-1349 because it was impracticable for Petitioners to raise their two objections during the notice-and-comment period and the objections were of central relevance to the final rule. Because we remand the final rule for EPA's reconsideration, we do not reach the merits arguments set forth in No. 15-1015.[1]

[1] Petitioners brought a third challenge to a separate final action by EPA on April 6, 2016, entitled "National Emission Standards for Hazardous Air Pollutants From Coal- and Oil-Fired Electric Utility Steam Generating

**I.**

The Clean Air Act ("CAA"), 42 U.S.C. § 7401 *et seq.*, was enacted "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population," § 7401(b)(1). In order to regulate the emission of toxic pollutants considered hazardous to public health, the CAA created a list of hazardous air pollutants (HAPs) and required EPA to promulgate restrictions on their emission by various sources. *See U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 593 (D.C. Cir. 2016) (per curiam). This case involves such restrictions on an important category of existing major sources, specifically utility boilers at coal-fired and oil-fired power plants. *See* § 7412(a)(10) (defining "existing source" as "any stationary source other than a new source"); *U.S. Sugar Corp.*, 830 F.3d at 593 (describing major sources as "'any stationary source or group of stationary sources' that neighbor each other, share common control, and emit (or have the potential to emit) either ten tons per year or more of any single HAP or twenty-five tons per year or more of any HAP combination" (quoting § 7412(a)(1))).

EPA must set HAP emission limits in the form of numerical limits whenever "feasible," § 7412(d)(2), (h)(4), and limits for major sources must be capped at the "the maximum degree of reduction in emissions" that EPA deems

Units and Standards of Performance for Fossil-Fuel-Fired Electric Utility, Industrial-Commercial-Institutional, and Small Industrial-Commercial-Institutional Steam Generating Units; Technical Correction." 81 Fed. Reg. 20,172 (April 6, 2016). We consolidated that challenge, contained in Petitioners' Petition for Review at No. 16-1169, with the two petitions discussed herein. Petitioners acknowledged both in their opening brief and at oral argument that they do not "specifically challeng[e] any portion of the final action at issue" with respect to that April 6, 2016, final action, so we dismiss the petition in No. 16-1169. Pet'rs' Opening Br. 3 n.1.

"achievable," § 7412(d)(2). EPA's determination of what is "achievable" is often referred to as a "MACT" standard, as in "maximum achievable control technology." *U.S. Sugar Corp.*, 830 F.3d at 594.

In setting a MACT standard, EPA follows a two-step process. *Id.* at 594. First, it creates a "MACT floor" for each category of emissions source that "ensures that all HAP sources at least clean up their emissions to the level that their best performing peers have shown can be achieved." *Id.* (internal quotation marks omitted). For sources like those at issue here, "the MACT floor cannot be less stringent than the average emissions limits achieved by the *best performing 12 percent of existing sources in that category or subcategory*." *Id.* (citing § 7412(d)(3)(A) (emphasis added)). Second, EPA may exercise its discretion "to require an even greater reduction in emissions, taking into account costs, health effects, environmental effects, and energy requirements." *Nat. Res. Def. Council v. EPA*, 529 F.3d 1077, 1079 (D.C. Cir. 2008) (citing § 7412(d)(2)).[2]

Congress recognized that numerical HAP emission limits for MACT standards may not always be "feasible," so it included § 7412(h), which enables EPA to promulgate number-alternative standards called "work practice" standards. § 7412(h); *see Sierra Club v. EPA*, 884 F.3d 1185, 1190 (D.C. Cir. 2018) ("Work practice standards can be thought of as a statutory Plan B; EPA may resort to them only when using numeric limits is not feasible." (internal quotation marks

---

[2] This second step, often referred to as "beyond-the-floor" limits, "risk-based" limits, or "health-based" limits after the factors listed in § 7412(d)(2), is not at issue here. *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 858 (D.C. Cir. 2001) (per curiam); *see also Nat. Res. Def. Council*, 529 F.3d at 1080.

omitted)). Relevant here, numerical MACT standards are not feasible (and thus "work practice" standards may be used) when "the application of measurement methodology to a particular class of sources is not practicable due to technological and economic limitations." § 7412(h)(2)(B). However, work practice standards must be, "in the Administrator's judgment," consistent with numerical MACT requirements, § 7412(h)(1), i.e., "the maximum degree of reduction in emissions" that EPA deems "achievable," § 7412(d)(2).

In addition, although not expressly contemplated by the CAA, we have held that EPA has the "flexibility" to "regulate a HAP indirectly, by controlling a proxy, or 'surrogate,' instead of the pollutant itself. . . . so long as the resulting rules are reasonably calculated to control the relevant HAPs to the extent the statute demands." *Sierra Club*, 884 F.3d at 1190 (citing *U.S. Sugar Corp.*, 830 F.3d at 628-29).

Finally, § 7607 sets forth the CAA's administrative proceedings and judicial review provisions applicable to standards promulgated under § 7412. 42 U.S.C. § 7607(b), (d)(1)(C). Notices of proposed rulemaking are published in the Federal Register, accompanied by a statement of the basis and purpose, the period available for public comment, and a summary of the factual data on which the proposed rule is based and the methodology used in obtaining and analyzing the data. § 7607(d)(3). Anyone may submit written comments and data in response to a proposed rule during the comment period, § 7607(d)(3), (d)(5)(i), but one is entitled to reconsideration by the Administrator after the period for public comment has passed if that person can show: (1) "it was impracticable to raise such objection within such time or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review)," and (2) "such objection

is of central relevance to the outcome of the rule,"
§ 7607(d)(7)(B). EPA's refusal to convene such a proceeding,
which is what happened here, is subject to judicial review. *See
id.*

With this statutory framework in mind, we turn to the
regulatory background that led to the final rule challenged here.

## II.

Coal- and oil-fired electric utility steam generating units
(sometimes referred to as "EGUs") are one of the main sources
of many HAPs emitted into our atmosphere. Air pollution from
utility boilers at coal-fired and oil-fired power plants can be
particularly problematic during a facility's startup or shutdown
period. According to EPA, an average power plant had
between 9 and 10 startup events annually between 2011 and
2012, but some plants had over 100 startup events in 2011.
Assessment – Revised, EPA-HQ-OAR-2009-0234-20451, at 4
(Nov. 2014). Environmental groups believe the number of
startup events will increase as renewable energy and gas-fired
units replace coal-fired power plants. Thus, EPA promulgated
specific emission standards applicable during these periods.

## A.

In February 2012, EPA promulgated the "MATS Rule,"
which set national emission standards for HAPs emitted from
utility boilers at coal-fired and oil-fired power plants. MATS
Rule, 77 Fed. Reg. 9,304, 9,380-83 (Feb. 16, 2012). Not to be
confused with MACT standards, MATS is shorthand for
"Mercury and Air Toxics Standards." *Id.* at 9,306. The MATS
Rule requires a power plant to comply with established
numerical emission limits at all times *except* during periods of
startup and shutdown. *Id.* at 9,466. The numerical emission

limits in the MATS Rule are "production-based," so EPA believed that startup periods – in which production is by definition non-existent – required separate emissions limits. *Id.* at 9,381. The MATS Rule defined the period of "startup" as

> either the first-ever firing of fuel in a boiler for the purpose of producing electricity, or the firing of fuel in a boiler after a shutdown event for any purpose. Startup ends when any of the steam from the boiler is used to generate electricity for sale over the grid or for any other purpose (including on-site use).

*Id.* at 9,486. EPA rationalized the definition "based on the fact that EGUs function to provide electricity primarily for sale to the grid but also at times for use on-site; therefore, EGUs should be considered to be operating normally at all times electricity is generated." *Id.* at 9,381. EPA acknowledged that it previously had proposed numerical emission standards for periods of startup, but it received a number of comments, with "[m]any commenters point[ing] to the lack of data in the record concerning emissions that occur during periods of startup." *Id.* The MATS Rule explained that of various data collected

> there were almost no HAP data for startup and shutdown periods and almost all of the data failed to meet our data quality requirements. Thus, we do not have sufficient data on emissions that occur during startup and shutdown on which to set emission standards.

*Id.* Therefore, the MATS Rule promulgated non-numerical work practice standards for periods of startup and shutdown. *Id.* The work practice standards set forth in the MATS Rule required, among others, EGUs to use clean fuels for ignition.

*Id.* at tbl. 3. The MATS Rule does not specifically cite to § 7412(h), which governs when work practice standards may be implemented in the place of numerical standards.

**B.**

Following the promulgation of the MATS Rule, "[t]he EPA received petitions [for reconsideration] asserting that the public lacked an opportunity to comment on the startup and shutdown provisions in the final MATS [Rule]." Reconsideration of Certain New Source and Startup/Shutdown Issues, 77 Fed. Reg. 71,323, 71,330 (Nov. 30, 2012). EPA acknowledged that it had previously "proposed numerical standards for startup and shutdown periods, and in response to comments on the proposed rule [it] changed those standards in the final MATS to work practice standards." *Id.* EPA reopened the period for comment on the nature of the work practice standards during the startup period. Contrary to Intervenors' assertion, EPA did not propose altering the endpoint of startup, which remained defined as the point in which the power plant is able to generate electricity.

**C.**

On June 25, 2013, EPA issued a Proposed Rule and Reopening of Comment Period. Reconsideration of Certain Startup/Shutdown Issues, 78 Fed. Reg. 38,001, 38,002 (June 25, 2013) ("2013 Proposed Rule"). EPA explained that in the preceding comment period, "comments raised several significant issues regarding the definition of startup," among other issues. *Id.* Commenters proposed new startup endpoints based not on when the source first generated electricity, but on the number of hours after an EGU hits certain operational benchmarks because then air pollution control devices

("APCDs") would be operational. *Id.* at 38,004. EPA noted that

> The commenters asserted that an EGU remains in "startup" mode beyond the first generation of electricity because, according to the commenters, at that point in time many of the APCDs needed to comply with the requirements of this subpart may not be technically or safely capable of operation and those that are may be operating far from design conditions because the requisite temperature(s) and/or flow conditions have not been achieved.

*Id*. at 38,003. EPA sought comments on these suggested definitions "so that the public can review the industry-provided information and data and comment on the suggested revisions to the startup and shutdown provisions." *Id.* at 38,002.

"In addition, the EPA request[ed] comment on the additional technical analyses it conducted in response to the above comments concerning the end of startup." *Id.* at 38,005 (citing Assessment of Startup Period at Coal-fired Electric Generating Units, EPA-HQ-OAR-2009-0234-20224 (June 17, 2013)). We refer to this technical support document, which accompanied the 2013 Proposed Rule, as the "2013 TSD." According to the 2013 Proposed Rule, the 2013 TSD "examined several indicators that can aid in assessing the time required to achieve operating benchmarks." 78 Fed. Reg. at 38,005.

The 2013 TSD identified those "several indicators" to be the removal efficacy of sulfur dioxide and nitrogen oxides emission APCDs, analyzing their average time for engagement across several categories. 2013 TSD, at 2. Although sulfur

dioxide and nitrogen oxides are not HAPs, "EPA believes that the removal efficacy of [these] APCDs, as evidenced by hourly emission rates well below uncontrolled levels, may be used as an indicator of the end of the startup period for the purpose of the MATS rule." *Id.*

The 2013 TSD identified a specific set of data[3] on emissions in order to identify all startup events at different types of boilers. *Id.* EPA analyzed when (in terms of hours) after generation sulfur dioxide and nitrogen oxides emissions were reduced by APCDs, and then categorized those results by combustion technologies, APCD type, and boiler type. *Id.* EPA's Assessment "found no significant difference in performance related to startup between the different groups assessed in this analysis," and "could support defining the end of startup at coal-fired EGUs as occurring at [a specific capacity threshold] plus 3 hours or the start of electricity generation plus 6 hours, whichever comes first." 78 Fed. Reg. at 38,005; *see also* 2013 TSD, at 19.

Neither the 2013 TSD nor the 2013 Proposed Rule referenced the work practice standards provision, § 7412(h), or analyzed its requirements for application.

---

[3] The data used in the 2013 TSD came from EPA's Clean Air Markets Database, which included data from EPA's Acid Rain Program. Petitioners base their arbitrary-and-capricious argument on EPA's alleged failure to explain how it may treat emissions post-generation as immeasurable based on EPA's measured emission data from another program. In other words, Petitioners argue that EPA failed to reasonably explain how it could treat similar situations differently. But as already noted, we need not reach that issue here.

11

**D.**

Several environmental groups, including Petitioners, submitted comments in response to the 2013 Proposed Rule. Petitioners commented on the feasibility of numerical measurability after generation, pointing out the broader problem that EPA failed to make any finding that numerical emission standards during this extended time frame were infeasible under § 7412(h) such that EPA could lawfully promulgate the extended period of work practice standards. Petitioners argued in their timely comment that "feasible 'measurement methodolog[ies]'" were available in order to demonstrate that EPA could not lawfully conclude that work practice standards were needed. J.A. 103 (quoting § 7412(h)(2)(B) (alteration in original)). Additionally, Petitioners pointed out that EPA's work practice standards "cannot be less stringent than 'the average emission limitation achieved by the best performing 12 percent of the existing sources, respectively.'" J.A. 163 (quoting § 7412(d)(3)).

**E.**

Ultimately, EPA adopted two alternative definitions of "startup," each with its own end point, in the final rule at issue here. Reconsideration of Certain Startup/Shutdown Issues, 79 Fed. Reg. 68,777 (Nov. 19, 2014) (codified at 40 C.F.R. § 63.10042) ("Final Rule"). Power plants may choose between the definitions because EPA "believe[s] that they both meet the requirements of [§ 7412] to reduce HAP emissions during this time period . . . ." *Id.* at 68,780. Once startup ends (regardless of which definition the plant uses), the plant must then comply with the MATS Rule's numerical emission requirements. *Id.* at 68,781.

The first startup definition mirrors the original definition from the 2012 MATS Rule and the November 2012 action: startup begins with "the first-ever firing of fuel in a boiler for the purpose of producing electricity, or the firing of fuel in a boiler after a shutdown event for any purpose," and it ends at electricity generation. *Id*. at 68,792. This portion of the Final Rule is not challenged here.

The alternative definition evolved from the proposed extended definition tested by the 2013 TSD. It defines the beginning of startup similarly to the first definition, but defines the end of startup as occurring at a later juncture: "Startup ends 4 hours after the EGU generates electricity . . . or 4 hours after the EGU makes useful thermal energy (such as heat or steam) for industrial, commercial, heating, or cooling purposes, whichever is earlier." *Id.* at 68,792 (internal citations omitted).

EPA acknowledged that the 2013 TSD "did not attempt to identify the EGUs that were the best performing sources, but instead simply looked at a category-wide average time for engagement of APCDs." *Id.* at 68,782. In order to "most closely follow[] the requirements" of § 7412(h), EPA "revised" its technical support documents to determine which EGUs "were able to most quickly engage their [sulfur dioxide and nitrogen oxides] APCDs because [EPA] determined that the best performing EGUs for purposes of defining the end of startup are those that are able to most efficiently engage their controls after the start of electricity generation." *Id.* We refer to this "revised" technical support document as the "Final TSD." Assessment – Revised, EPA-HQ-OAR-2009-0234-20447.

The 2013 Proposed Rule connected the removal efficacy of APCDs regulating sulfur dioxide and nitrogen oxides emissions to "achiev[ing] operating benchmarks," 78 Fed. Reg.

at 38,005, specifically the point where "APCDs needed to comply with the requirements of this subpart [became] technically or safely capable of operation," *id.* at 38,003. The Final Rule filled in some gaps. According to the Final Rule, sulfur dioxide and nitrogen oxides emissions can be proxies of other emissions and their APCDs aid in the engagement of HAP controls "that industry commenters stated required additional time to engage after the start of generation of electricity or useful thermal energy." 79 Fed. Reg. at 68,781. The takeaway in the Final Rule was that EPA believed the removal efficacy of APCDs regulating sulfur dioxide and nitrogen oxides emissions was reliable evidence of when EGUs can begin to not only *remove* pollutants but *measure* HAP emissions. *See id.* at 68,780.

**F.**

Petitioners submitted a petition for reconsideration of the Final Rule that objected to the alternative extended startup definition. Specifically, Petitioners objected to EPA's late-breaking selection of the best performing power plants which formed the basis of its Final TSD analysis and objected to EPA's conclusion that work practice standards were lawful under § 7412(h) beyond electricity generation. EPA denied the petition on August 8, 2016. Reconsideration on the [MATS] and the Utility New Source Performance Standards Startup and Shutdown Provisions; Final Action, 81 Fed. Reg. 52,346, 52,346 (Aug. 8, 2016). EPA explained why it was denying the petition for reconsideration in a separate document accompanying the Federal Register notice. *See* Denial of Petitions for Reconsideration of Certain Startup/Shutdown Issues: MATS, EPA-HQ-OAR-2009-0234-20581 (July 29, 2016).

14

## III.

Although EPA and Intervenors do not challenge Petitioners' standing under Article III to seek judicial review of both the denial of the petition for reconsideration and the Final Rule, the Court has an independent obligation to ensure standing exists. The Court concludes that because at least one Petitioner – Sierra Club – demonstrates standing, this case may proceed to the merits. *See Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 182 (D.C. Cir. 2017) ("When more than one association brings suit, we need only find one party with standing to satisfy the requirement." (internal quotation marks and citations omitted)).

Article III of the Constitution provides an association with standing to sue "only if (1) at least one of its members would have standing to sue in his own right; (2) the interest it seeks to protect is germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the member to participate in the lawsuit. " *Am. Trucking Ass'ns v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 247 (D.C. Cir. 2013) (internal quotation marks and citations omitted). Sierra Club's member's standing here, as demonstrated in the declaration attached to Petitioners' Reply,[4] is clear for the same reasons we articulated in previous cases involving these parties:

> [Its] members "unquestionably live[d] within zones they claim are exposed to" regulated air pollutants and "our vacatur [would] require

---

[4] Petitioners submitted declarations from other members with their opening brief, but Petitioners later "realized that the power plants harming Petitioners' opening-brief standing declarants have not elected to use the extended startup period." Pet'rs' Reply Br. 3. We accept the declaration submitted with Petitioners' reply. *See Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 599 (D.C. Cir. 2015).

> EPA . . . to entertain and respond to the [Petitioners'] claims about the necessary scope and stringency of the standards" for regulating those pollutants.  Sierra Club has "shown its members' . . . concrete interest" of a type that its asserted procedural interest is "plainly designed to protect" and that its injury "is potentially redressable" by further agency action on remand.

*Sierra Club v. EPA*, 926 F.3d 844, 849 (D.C. Cir. 2019) (quoting *Sierra Club v. EPA*, 699 F.3d 530, 533 (D.C. Cir. 2012)). Because the interest Sierra Club seeks to protect is germane to its purpose and neither the claim asserted nor the relief requested requires the member to participate in the lawsuit, Sierra Club has established standing.

**IV.**

As we noted at the outset, Petitioners challenge both EPA's denial of their petition for reconsideration and the Final Rule itself. The portions of the petition for reconsideration at issue here attack EPA's determination in the Final Rule that the "best performing" power plants cannot reliably measure emissions until four hours after they generate electricity.  This objection is really two-fold.  First, Petitioners argue that EPA did not analyze which power plants were the "best performers" until the Final TSD, thus depriving Petitioners of the opportunity to timely comment.  Second, Petitioners argue EPA's best-performers analysis was based on an underlying assumption that the point at which power plants begin to operate their APCDs and remove pollutants can be used as a proxy for when it becomes feasible to measure HAP emissions, an assumption not disclosed prior to the Final Rule.

Petitioners seek relief in the form of an order compelling EPA to reconsider the Final Rule in light of their objections. While Petitioners ask the Court to vacate the denial of the petition for reconsideration, they do not ask the Court to vacate the Final Rule itself. At oral argument, Petitioners acknowledged that if we remand for reconsideration under § 7607(d)(7)(B), we need not reach their additional arguments that the Final Rule, as it stands now, is arbitrary and capricious. *See* Oral Arg. Rec. at 22:00-26. Because we conclude that Petitioners' reconsideration petition raised objections that were both impracticable to raise during the comment period and centrally relevant to the outcome of the Final Rule, *see* § 7607(d)(7)(B), we vacate EPA's denial of that petition and remand for EPA's reconsideration on these matters.

In *Clean Air Council v. Pruitt*, we declined to resolve a dispute about whether our review of EPA's treatment of the two § 7607(d)(7)(B) elements is subject to *de novo* review or arbitrary-and-capricious review, concluding that EPA erred even under the more deferential arbitrary-and-capricious standard. 862 F.3d 1, 10 (D.C. Cir. 2017) (per curiam). Here, Petitioners seek *de novo* review, arguing that "EPA has no greater expertise than this Court in determining whether the requirements of § 7607(d)(7)(B) have been satisfied." Pet'rs' Opening Br. 35. EPA does not directly respond to this argument, only articulating that the arbitrary-and-capricious standard governs its "action in promulgating a rule." Resp't's Br. 23. Further complicating matters, we have previously applied the abuse-of-discretion standard in cases where we are asked to "reverse an agency's denial of reconsideration." *AT&T Corp. v. FCC*, 363 F.3d 504, 509 (D.C. Cir. 2004); *see North Carolina v. EPA*, 614 F. App'x 517, 519 (D.C. Cir. 2015) (unpublished decision applying abuse-of-discretion standard, citing to *AT&T Corp.*, to review of EPA's denial of a petition for reconsideration under § 7607(d)(7)(B)).

We need not resolve this issue here, as the same conclusion in *Clean Air Council* can be made here. Even under the more deferential arbitrary-and-capricious standard, EPA erred in concluding that the two identified issues from Petitioners' petition for reconsideration did not meet the two requirements for reconsideration under § 7607(d)(7)(B).

**A.**

We conclude that the first element of § 7607(d)(7)(B) is met because it was impracticable to raise either of the two objections during the period for public comment. The first element's impracticability prong – rather than the "arising after" prong – is met "when the final rule was not a logical outgrowth of the proposed rule." *Alon Refining Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 648 (D.C. Cir. 2019) (per curiam).

> A final rule is the "logical outgrowth" of a proposed rule if "interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." A final rule "fails the logical outgrowth test" if "interested parties would have had to divine the agency's unspoken thoughts, because the final rule was surprisingly distant from the proposed rule."

*Clear Air Council*, 862 F.3d at 10 (quoting *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1080 (D.C. Cir. 2009)).

It is undisputed that the 2013 Proposed Rule was the first time that EPA introduced the idea of extending work practice standards beyond the point of generation to several hours after

generation. It is also undisputed that the 2013 Proposed Rule and 2013 TSD did not identify which sources were considered the "best performing," and neither referenced the section governing when work practice standards may replace numerical standards – § 7412(h).

**1.**

The Final Rule's reliance on an identified list of best performing power plants was not a logical outgrowth of the 2013 Proposed Rule. Given the Proposed Rule's lack of any mention of best performing sources or § 7412(h), Petitioners simply could not have anticipated during the comment period that EPA would convert the 2013 Proposed Rule – based on data of when all power plants engage pollutant controls – into an analysis of when then-unidentified best performers could engage their controls.

It is true that Petitioners did comment on the lack of best performing source analysis during the comment period. EPA argues that this forecloses relief, relying on *Portland Cement Ass'n v. EPA*, for the premise that a final rule is a logical outgrowth of the proposed rule where a petitioner commented on the issue. 665 F.3d 177, 189 (D.C. Cir. 2011) (per curiam). But in *Portland Cement*, the Court noted that EPA *had* sought comment on the matter *and* the petitioner had commented. *Id.* *Portland Cement* does not stand for the proposition that an individual's comment in and of itself demonstrates sufficient notice from EPA to the individual. To the contrary, in Petitioners' cited *CSX Transportation*, this Court recognized that "notice must come from the [Notice of Proposed Rulemaking,]" not the comments arising out of it. 584 F.3d at 1082. Because nothing in the 2013 Proposed Rule indicated EPA was setting its standards based on the best performing sources, the Final Rule's reliance on its newly selected "best

performers" cannot be considered a logical outgrowth of the 2013 Proposed Rule. Thus, it was impracticable for Petitioners to have raised this challenge during the comment period. Besides, even if we did consider the Petitioners' mention of a best-performer analysis as relevant to the logical outgrowth test, their comment raised that analysis in a different context. Namely, Petitioners' comment argued that EPA was required to apply a best-performer analysis in setting the work-practice standards; they said nothing of employing a best-performer analysis in order to determine the duration of startup.

Even if reliance on any "best performing sources" could be considered a logical outgrowth, EPA's process for identifying those best performing sources was certainly not. To hold otherwise would place the unreasonable burden on commenters not only to identify errors in a proposed rule but also to contemplate why every theoretical course of correction the agency might pursue would be inappropriate or incorrect. It was simply impracticable for Petitioners to predict how EPA would cure the missing "best performer" component and then submit preemptive attacks on such hypothetical solutions. For this reason, we find unavailing EPA's argument that mere similarities in analytical approaches of the 2013 TSD and the Final TSD render the latter a logical outgrowth of the former. EPA gave no notice that it would analyze *any* best performing stringency requirements, so EPA cannot now claim that Petitioners were on notice of how EPA would ultimately analyze such issues.[5] There was simply no opportunity for

---

[5] Furthermore, EPA's argument that it applied the "*same* analytical approach" in the Final TSD as it did in the 2013 TSD is blatantly erroneous. Resp't's Br. 30 (emphasis added). The process by which EPA went about discerning which sources were the best performing required additional calculations and data tinkering beyond what EPA did in the 2013 TSD. For example, the Final TSD eliminated data from 563 startup events in which "electricity generation lasted less than 4 hours before fossil fuel combustion

Petitioners to weigh in on whether additional factors beyond what was considered in the 2013 TSD should be considered when determining which sources are the best performing.

To sum up, Petitioners were not given the opportunity to comment on, propose revisions to, or otherwise challenge the process for selecting the "best performing" power plants that EPA first unveiled in the Final TSD. In this respect, because the final rule was not a logical outgrowth of the 2013 Proposed Rule, this first objection satisfies the first element of § 7607(d)(7)(B).

**2.**

Turning to their second objection, Petitioners argue that EPA did not disclose "the critical reasoning behind its measurability analysis until its [F]inal [R]ule." Pet'rs' Opening Br. 42. It was only then, say Petitioners, that EPA asserted "that the point at which power plants begin to operate their pollution controls can be used as a proxy for when they can measure emissions," *id.*, because no technologically and economically feasible methodology exists to measure HAP emissions up until that point, *see* § 7412(h)(2)(B).

As we demonstrate above, the Final Rule is the first time EPA connects an EGU's ability to *remove* pollutants with its ability to *measure* HAP emissions. *Id.* at 68,779-80. EPA is correct that the 2013 TSD articulated that it was using certain removal efficacies as a proxy for the end of startup. The end of startup is clearly the beginning of when emissions are to be numerically measured for purposes of complying with existing numerical limits set forth in the MATS Rule. But nowhere in

ended" and then "calculated the 2-hour rolling average emission rate." Final TSD, at 20. The 2013 TSD does not indicate similar methods.

the 2013 TSD or the 2013 Proposed Rule does EPA express its belief that emissions are *immeasurable* from the point of electricity generation until the APCDs become operational. This key link is a critical statutory requirement for EPA to lawfully deviate from numerical standards and impose alternative, non-numerical work practice standards. Simply put, the 2013 Proposed Rule failed to disclose that it was using APCDs' effectiveness as a proxy for measurability.

Again, recognizing that the 2013 Proposed Rule seriously lacked compliance with § 7412(h)'s requirements, Petitioners timely commented on the measurability of pollutants. Petitioners pointed out that EPA failed to make any finding that numerical standards remained infeasible after the generation of electricity (the startup end point in the first definition) to justify work practice standards during the extended period of time in the alternative definition. Petitioners' comment also argued that feasible measurement methodologies existed. EPA again pounces on this comment, arguing that Petitioners' timely comment on feasibility is sufficient to show that it was not impracticable for Petitioners to timely object to the use of APCDs as a proxy for measurability.

We conclude that EPA clearly erred in faulting Petitioners' failure to divine from the 2013 TSD that EPA would later conclude under § 7412(h)(2)(B) that specific emission measurements during startup show that HAP emissions cannot be measured in a technologically and economically feasible way.

Despite "conced[ing] that the 2013 Proposal could have been more explicit" on this point, EPA doubles down, arguing that the challenged premise – "that it was not feasible to establish numeric limitations" for HAPs until APCDs became operational – "was central" to the 2013 Proposal, Resp't's Br.

32, even though the 2013 Proposal lacks any reference to measurement feasibility or § 7412(h).[6] But commenters do not have to be mind readers, and this is exactly the kind of "divin[ation]" of "unspoken thoughts" that the logical outgrowth test rejects. *Clear Air Council*, 862 F.3d at 10 (quoting *CSX Transp., Inc.*, 584 F.3d at 1080). This second objection also passes the first § 7607(d)(7)(B) element.

**B.**

The parties agree that § 7607(d)(7)(B)'s second element, central relevance, asks whether the objections provide substantial support for the argument that the regulation should be revised. Both of Petitioners' objections surpass that hurdle, as they go to the very legality of the Final Rule's § 7412(h) work practice standards for the extended startup period. *See Kennecott Corp. v. EPA*, 684 F.2d 1007, 1019 (D.C. Cir. 1982) ("Because the reasonableness and accuracy of the forecast data is critical to whether a smelter can qualify for an NSO, [petitioners'] objections to that data, if well-founded, would clearly have been 'of central relevance.'" (citing § 7607(d)(7)(B))).

EPA argues that Petitioners' objections cannot be centrally relevant because they lack merit. We are not so convinced. What is clear is that if different best performers are selected, the extended startup definition's end point would have to be

---

[6] Intervenors make the same argument, claiming "measurement impracticability was a primary issue underlying the entire reconsideration proceeding." Intervenors' Br. at 10. This may indeed be true for the MATS Rule's definition of startup – and Petitioners do not challenge the feasibility of measurability up until generation – but EPA's radio silence on the matter after proposing a new, extended endpoint of startup deprived Petitioners of the opportunity to comment on this issue as it applied to an extended period of startup.

recalculated, and unless EPA demonstrates that measurability is infeasible until APCDs become operational, work practice standards cannot be applied. These issues certainly meet the "central relevance" requirement. § 7607(d)(7)(B).

## VI.

For the foregoing reasons, the Court grants Petition No. 16-1349, vacates EPA's denial of the petition for reconsideration, and remands to the agency for reconsideration. Petition Nos. 15-1015 and 16-1169 are dismissed.

*So ordered.*